## R. J. RICHARDS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 52848.   Promulgated June 29, 1934.

*C. E. McDowell, Esq.*, for the petitioner.
*Elden McFarland, Esq.*, for the respondent.

### OPINION.

MARQUETTE: The respondent has determined deficiencies in income tax for the years 1927 and 1928 in the respective amounts of $486.69 and $12,552.81.   The only issue is whether certain real estate sold in the taxable years constituted capital assets within the meaning of section 208 (a) (8) of the Revenue Act of 1926, and section 101 (c) (8) of the Revenue Act of 1928.

This proceeding was submitted upon a stipulation of the parties to the effect that two affidavits of the petitioner, one dated October 20, 1930, together with exhibits thereto attached, and the other dated September 15, 1933, might be received in evidence, and that the respondent agreed that if the petitioner was called as a witness he would testify as set forth in the affidavits.   However, respondent did not agree that all of the facts and conclusions stated in the affidavits were correct.   The affidavits and exhibits are made a part of this report.

The material facts are that the petitioner and his wife made joint income tax returns for the years before us, and that the real property involved was acquired by them as joint tenants with the right of survivorship.   Since prior to 1920 the petitioner, for himself or as a member of a partnership, has been engaged in the business of raising, packing, buying, and marketing farm products, particularly lettuce.   About September 15, 1920, petitioner and his wife acquired title to approximately 47 acres of land in Los Angeles County, California.   About April 30, 1921, they acquired another tract adjoining the above tract, containing about 4 acres.   About March 11, 1922, they acquired title to a third piece of land adjacent to the foregoing tracts.   These tracts of land at the time of acquisition lay in a very productive farming area and were used by the petitioner in the raising of lettuce and sometimes chicory and

endive. They were surrounded by farm lands producing these same vegetables. The products of these adjacent lands, together with the products of the petitioner's own lands, enabled him to make shipments in carload lots.

In 1921 the petitioner erected buildings and other structures on not over three and one half acres of these lands, which were thereafter used by him as a combined office and residence.

After the petitioner acquired these properties there was a great deal of real estate activity in the lands between his property and the boundary of the city of Los Angeles. The intervening property began to be subdivided and sold, with the result that the petitioner's property rapidly increased in value until it arrived at a value in excess of $4,000 an acre without improvements. Taxes and assessments for local improvements also increased. The taxes on this property in 1920 were $657.84 and for 1924 were $5,903.22, in addition to which the petitioner was required to pay $4,479.95 in 1924 on account of special assessments. This rise in prices made the use of these lands and the adjacent lands for gardening purposes unprofitable, and in this way deprived the petitioner of a base from which to ship the vegetables in carload lots.

In 1925 petitioner determined to subdivide a part of the first parcel of land which he had purchased. In pursuance of this plan on July 15, 1925, he conveyed a portion of the property to the Security Trust & Savings Bank of Los Angeles (now Security Trust National Bank of Los Angeles) hereinafter referred to as the bank, which accepted it in trust to secure a note of $28,500 which petitioner and his wife owed the bank, and upon further trust to subdivide and sell the property conveyed. Under the deed of trust petitioner and his wife agreed to pay all taxes and assessments levied on the property, to pay principal and interest on all indebtedness secured by the trust, to pay all claims, liens and encumbrances and defend all suits affecting the property, to pay for all improvements ordered by him or his agent, and to file with the trustee a copy of each contract for improvements to be placed on the property. The property was to be subdivided and improved by the petitioner and his wife.

The deed contains provisions which permitted the trustee, upon default of petitioner and his wife in paying the above amounts, to pay them itself, and gave it recourse against the property. The trustee was authorized to rent, sell and convey the property or any part thereof to such persons and at such times as it deemed best, provided the sale prices of the lands should not be less than those indicated in the schedule to be filed with the deed. The proceeds received from the sales were to be used to pay commissions and to release liens, the balance to go in what was termed a general fund,

out of which the cost and expenses of the trust and certain other expenses were to be paid, and what remained over was to be paid to the petitioner and his wife. The deed recites that at the request of the petitioner and his wife it appointed P. N. Snyder " as their exclusive agent to subdivide and improve, and to solicit and obtain purchasers for such part of said property " as was subdivided. He was paid a commission, out of which he was to pay for advertising and other selling expenses of himself and his subagents. Among the duties assumed by the agent was the general care and custody of the subdivided property, and of all improvements placed upon the property, which included the installation of gas, water and electricity. The trustee was not required to procure any insurance on any building upon the property, or to collect or disburse any rentals therefrom. These duties were to be performed by the petitioner and his wife.

Upon payment in full of the indebtedness secured by the deed and at the request in writing of petitioner and his wife, the trustee was given authority to close and terminate the trust, but was not required to do so as long as any of the covenants contained in any deed remained unperformed. The petitioner and his wife furnished the trustee a list of the minimum prices at which the lots were to be sold. The number of lots was 186. The minimum price was $1,250 and the maximum price was $40,000 per lot.

The sales of lots in the first subdivision having proved satisfactory, petitioner determined to subdivide other portions of the property above described. By deed of August 6, 1926, the bank accepted in trust property previously conveyed. The provisions of this trust deed resembled the one of July 15, 1925. Afterward, the petitioner and his wife determined to subdivide and sell the remaining portion of the property purchased as hereinabove set forth, and by deed of trust dated January 12, 1927, the bank accepted such property on practically the same trusts as those provided in the deed of July 15, 1925.

The principal reason for the above conveyances was to have all deeds on lots promptly executed, especially in the absence of the petitioner from Los Angeles. The number of lots in the second subdivision above set forth was 82. The number of lots in the third subdivision was 152. In the third subdivision the minimum price for the lots was $1,200 and the maximum was $15,000. Under each of the deeds, Snyder was appointed by the bank as petitioner's exclusive agent, at his request, for a term of eight months, with the right to serve eight months more upon achieving certain results, and upon the termination of his employment the trustee was to appoint as agent for the petitioner and his wife such person as they directed, all sales, however, to be subject to the approval of the trustee of the

bank. The petitioner's business of producing, packing and selling lettuce and other vegetables increased from year to year, and he substituted, either by lease or purchase, farming properties for the properties which he subdivided. The petitioner, himself, has never taken part in the subdivision or the sale of the lots in the subdivisions, all of which was done by Snyder. Except as herein set forth, the petitioner has never engaged in the business of buying and selling real estate or dealt therein. He has not been licensed as a broker to buy or sell real estate.

The petitioner seeks to have the gain derived from the sale of the lots in his subdivisions taxed under the provisions of section 208 of the Revenue Act of 1926 and section 101 of the Revenue Act of 1928. The only issue is whether the lands from which the lots were carved constituted " capital assets " as that term is defined in the above sections. Section 208 (a)(8) of the Revenue Act of 1926 provides:

> The term " capital assets " means property held by the taxpayer for more than two years (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale in the course of his trade or business. * * *

Section 101 (c)(8) of the Revenue Act of 1928 is not materially different. If we eliminate the intervention of the trustee, it is clear that petitioner and his wife at the dates of the various sales had held the lands for more than two years. We do not think the fact that when the sales were made the legal title was in the trustee, is material. The conveyances were made for two purposes—first, to secure the bank, which was also trustee, for its loan then made to petitioner and his wife and to secure it for the advances thereafter to be made, and, second, to facilitate the execution and delivery of deeds to purchasers of the lots in the absence of the petitioner. On them, as individuals, remained the duty of paying all taxes and liens and advancing the money with which the pay the cost of subdivision and improvements and of insurance on the improvements. After paying the debts secured by the deeds and the cost and expenses of the trust and of the sales, what was left, corpus and income, was to be paid to the petitioner and his wife. The petitioner and his wife possessed all the substantial rights of ownership. The lands were held by them within the meaning of the above provisions. *Carrie E. Molter*, 19 B.T.A. 911; affd., 60 Fed. (2d) 498; *San Martinez Oil Co.*, 25 B.T.A. 218.

Real estate may not be included in inventory. *Willard Pope*, 28 B.T.A. 1255, and cases cited. The facts show, and counsel for the petitioner concedes, that the lots were held primarily for sale. There

remains for solution the question whether they were so held by the petitioner "in the course of his * * * business."

The fact that the petitioner was in the business of producing and marketing vegetables did not preclude him from engaging in another distinct business. Counsel for the petitioner concedes this and such is the law. *Ignaz Schwinn*, 9 B.T.A. 1304; *John D. Roney*, 26 B.T.A. 1213; affd., 67 Fed. (2d) 165. Neither do we think it is material that these lands, which were the individual properties of the petitioner and his wife, were once used by them in the farming business. Such use was abandoned and the lands were devoted to a very different purpose. There is nothing in the sections involved which makes any reference to the purpose for which the assets were acquired. To illustrate, one may, as here, own land devoted to farming and, having discovered minerals below the surface, proceed to mine and dispose of the minerals. The fact that he once used the land in connection with farming does not detract from the fact that he thereafter used it in the business of mining.

We may here dispose of the issue raised by the petitioner that in disposing of the lots by sale he was liquidating his business of farming, or at least a part of it. He relies on *Trustees for the Creditors and Stockholders of Gonzolus Creek Oil Co. (dissolved)*, 12 B.T.A. 310; *Wilson Syndicate Trust*, 14 B.T.A. 508; *Dauphin Deposit Trust Co., Trustee*, 21 B.T.A. 1214; *G. F. Sloan*, 24 B.T.A. 61; *Blair v. Wilson Syndicate Trust*, 36 Fed. (2d) 43; *White v. Hornblower*, 27 Fed. (2d) 277. We do not perceive the relevancy of these cases. Not only has the petitioner not liquidated his business of farming, but, as we read the record, he has enlarged it. What he has done is to take certain assets individually owned and devoted them to a new purpose.

Cleared of all obscurities, the issue is whether in doing this the petitioner engaged in a business. In attempting to define this term we said, in *Willard Pope, supra*:

In *Flint v. Stone Tracy Co.*, 220 U.S. 107, the Court said:

"Business" is a very comprehensive term and embraces everything about which a person can be employed. Black's Law Dict. 158, citing *People ex rel. Hoyt v. Tax Comrs.*, 23 N.Y. 242, 244. "That which occupies the time, attention, and labor of men for the purpose of a livelihood or profit." 1 Bouvier's Law Dict. p. 273.

On the other hand, isolated transactions do not constitute the carrying on of a trade or business. *Mente v. Eisner*, 266 Fed. 161; *Bedell v. Commissioner*, 30 Fed. (2d) 622; *Washburn v. Commissioner*, 51 Fed. (2d) 949. It is often difficult to apply the general definitions, with the result that "the decision in each instance must depend upon the particular facts before the court." *Von Baumbach v. Sargent Land Co.*, 242 U.S. 503.

Here we have no isolated transactions. Two of the subdivisions were laid out in 1925 and one in, January 1927. The total number

of lots in the three subdivisions was 420. Streets and alleys were laid out and, we assume, were improved. The trust deeds disclose elaborate provisions for improvements and places the cost of them on the petitioner and his wife. What these improvements were is not disclosed, except that they included the installation of gas, water and electricity. We are informed that rentals were to be collected by the petitioner and his wife, and that all insurance was to be procured and paid for by them. All this involved the expenditure of money and that money was to be raised and paid by these same individuals. If these provisions were not carried out, the burden rested on the petitioner to so show. This he has failed to do, and he must bear the consequences. A selling agent was employed and he was to have subagents. He was to have charge of advertising. Here we have continuity of effort. All this was done for gain, and it falls squarely within the concept of the term " business." Whose business was it? The plan was conceived by the petitioner who, with his wife, owned all the assets of the business. The fact that to a large extent he confided the management of this business to his agent, Snyder, and to the trustee, does not make it any the less his business. As we said in *Willard Pope, supra*, " it is axiomatic that one may confide the management of his business to another; but it still remains the business of the owner."

We are of opinion that the lots were held by the petitioner primarily for sale in the course of his business. *Willard Pope, supra.* Cf. *Sloan v. Commissioner*, 63 Fed. (2d) 666; affirming 24 B.T.A. 61.

*Judgment will be entered for the respondent.*