Myra C. Brown v. Commissioner.
Brown v. Commissioner
Docket No. 108926.
United States Tax Court
1943 Tax Ct. Memo LEXIS 134; 2 T.C.M. (CCH) 714; T.C.M. (RIA) 43403; August 31, 1943
*134 J. L. Lockett, Esq., 2201 Gulf Bldg., Houston, Tex., for the petitioner. Wilford H. Payne, Esq., and L. R. Van Burgh, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: Petitioner is an individual residing at 707 Holman Avenue, Houston, Texas. Her income tax returns for the calendar years 1937, 1938 and 1939 were filed with the collector of internal revenue for the first district of Texas at Austin, Texas. The taxes in controversy are proposed deficiencies in income tax, as follows: 1937
$1,815.26
1938
1,290.34
1939
484.73
Total
$3,590.33
The petitioner alleges that the respondent erroneously included in her income for 1937, 1938 and 1939, the amounts of $12,741.23, $9,805.48, and $5,419.05, respectively, designated in the notice of deficiency as "profit on sales of lots." She further alleges that the respondent erroneously included in her income for the year 1937 the amount of $2,009.48, designated in the notice of deficiency as "Depletion restored to income." Other adjustments in the deficiency notice are not here contested. Findings of Fact Prior to the death of petitioner's husband, Ed. R. Brown, in November, 1928, petitioner *135 and her husband owned as community property approximately 500 acres of unimproved land, formerly used for cattle grazing purposes, located about three miles from Baytown, Harris County, Texas, near a settlement called "Wooster". Under the will of her deceased husband, petitioner acquired the undivided one-half interest in said land which had formerly been owned by him, thus becoming full owner of the land. The estate of Ed. R. Brown had no assets other than the land. There was an outstanding indebtedness of approximately $20,000 secured by a mortgage upon the land, held by the First National Bank in Houston, Texas. About 1930 the bank requested payment and petitioner, through her son, Edwin Brown, negotiated a new loan with the Hermann Hospital Estate in Houston in an amount sufficient to pay off the bank and leave a surplus from which could be paid interest accruing on the new loan until the land could be sold. Revenue from the land was insufficient to pay taxes thereon. Early in 1929, petitioner listed the land for sale in its entirety with Roderick M. Montgomery, a licensed real estate broker residing in Houston, Texas, and a friend of the Brown family. Upon Montgomery's suggestion, *136 after unsuccessful attempts to sell the property, it was listed for sale with several other real estate agents, but also without success. In 1936, the first sales were made of two small tracts, one of 5 acres and one of 2 1/2 acres, which could easily be segregated from the main body of theland. Montgomery ascertained in that year that there was a strong demand for larger lots than the average city lots then available in Baytown and after contacting a number of people he was convinced that he could sell considerable of petitioner's property in half acre and acre tracts. Petitioner had three adult children, a son, Edwin, who lived in Boston, Massachusetts, and two married daughters, one of whom lived in Iowa and the other in Tampico, Mexico. She felt that her children should have a voice in determining what should be done about selling the land, for it would go to them after her death. She depended largely upon her children for advice as to her affairs. She herself had no business experience and the children knew nothing of the real estate business. In 1937, Montgomery advised the Brown family that he could dispose of the property if it was subdivided into small tracts. He was authorized *137 by the Browns to subdivide the property and develop it for sale, provided it could be financed without help from them. Petitioner knew about the negotiations between her children and Montgomery, authorized the children to make arrangements for the sale of the land, and approved of the instructions they gave Montgomery pertaining to its subdivision. No formal contract was entered into with Montgomery, the arrangements having been made orally and through an interchange of correspondence. The details of planning and arranging subdivisions were worked out by Montgomery. Annually, generally around Christmas time, petitioner's family would come to Houston for the holidays and Montgomery would take them to the land, show them what had been done and give them an outline of what he had in mind for the coming year. Petitioner did not concern himself with any of the details, but she had a general knowledge of what was going on all the time. Everything done by Montgomery in regard to the subdivisions and sales of lots was with her general consent, knowledge and approval. She felt that Montgomery was representing her in taking care of these matters. In regard to the first subdivision, Montgomery *138 went to see two surveyors and a grading contractor, told them that he had customers ready to buy lots but that he couldn't sell until the lots were staked and platted, and that they could not be paid for the necessary work until sales were made. He undertook personally to recompense them to some extent if sales were not made. The men agreed to undertake the work on this basis and they laid out a block of 30 lots, about one acre each, 25 of which were sold in 1937. The surveyors and grading contractors were paid by petitioner from the proceeds. No improvement work was done on the lots themselves, the purchasers taking them "as is". Streets were cleared, graded and shelled to a width of about 16 feet with shells taken from shell banks on the property. There were no sidewalks or curbs. Storm sewers were put in at street intersections. Another subdivision was laid out in 1937, making a total of 106 lots that year; one subdivision was completed in each of the years 1938 and 1939, consisting of 57 lots and 37 lots, respectively. These four subdivisions covered 103 acres of land owned by petitioner. In all, 32 lots were sold in 1937, 29 in 1938 and 19 in 1939. Since 1939, 64 more acres *139 were platted into 131 lots. 19 lots were sold in 1940, 17 in 1941 and 6 in 1942, to the date of the hearing. The plats of all of the subdivisions were executed by the petitioner herein. In them she dedicated to public use the necessary streets and parks. The subdivisions are generally known as "Brownwood". Contracts of sale were prepared by Montgomery and signed by petitioner, or by her sister, Miss Anne Cabaniss, acting under a power of attorney from petitioner. Deeds were executed by petitioner when sufficient amounts had been paid under the contract of sale. Purchasers' notes were made payable to petitioner. Payments by purchasers were made either to Montgomery or to petitioner's sister. All amounts collected by Montgomery were turned over to petitioner's sister who deposited all collections in a bank account opened in petitioner's name. Petitioner's sister kept a set of books for petitioner relating to the subdivisions. All bills were presented to petitioner or to her sister for payment and they were paid by petitioner by checks drawn upon her bank account. Montgomery's commissions upon sales were also so paid. Montgomery testified that his commission rate was 5 percent in 1937, *140 but was increased to 10 percent for subsequent years due to the increased work in connection with the subdivisions. By 1938, sufficient funds had accumulated from the sale of lots to permit petitioner to enter into contracts with public utilities to construct electric and gas lines to supply the subdivisions. The details of these contracts were negotiated by Montgomery, who presented them to petitioner for signature. Petitioner signed them without careful scrutiny, relying upon Montgomery's judgment. Under the terms of these contracts, the costs of the extensions were to be paid by petitioner out of the proceeds of the sales, a certain amount thereof to be refunded by the companies when thelines were placed on a paying basis. Petitioner had a well dug and put in, and maintained a water supply system at her expense to supply those parts of the subdivisions where there was no water already available. There was no sales office on the property. Montgomery would obtain leads from a man otherwise employed in the Humble Oil Company refinery at Baytown, Texas; would call upon the prospects so obtained; and, in the event of a sale, he would pay his man a small commission out of his own. *141 Montgomery ran only one advertisement at his expense in 1938. Petitioner did not concern herself with sales methods. In the taxable years 1937, 32 lots were sold for the sum of $26,661.03, resulting in a profit of $19,235.47, of which $10,999.53 represents gain with respect to the undivided half interest in the land which was owned by the petitioner prior to her husband's death and which had been held for more than ten years prior to sale, and $8,235.94 represents profits in respect of the undivided half interest in the property which had been acquired by petitioner by devise from her husband and which had been held for more than five years but less than ten years prior to sale. In her 1937 return, petitioner reported the $10,999.53 as capital gain, of which 30 percent, or $3,299.86, was treated as taxable, and the $8,235.94 was also reported as capital gain, of which 40 percent, or $3,294.38 was treated as taxable. In 1938, 29 lots were sold for $30,706.35, resulting in a profit of $19,610.96, all of which represents profit in respect of property held for more than 24 months prior to sale. In her 1938 return, petitioner reported the profit as capital gain, of which 50 percent or *142 $9,805.48, was treated as subject to tax. In 1939, 19 lots were sold for $15,995, resulting in a profit of $10,838.10, all of which represents profit in respect of property held for more than 24 months prior to sale. In her 1939 return, petitioner reported said profit as capital gain, of which 50 percent or $5,419.05 was treated as subject to tax. In computing the deficiency in controversy for each of the taxable years, the respondent included as taxable income the entire amounts of the profits derived from sales of lots in each of such years, denying the petitioner the benefits of section 117 of the Revenue Act of 1936 for 1937, of the Revenue Act of 1938 for 1938, and of the Internal Revenue Code for 1939, and treating such profits as ordinary gains rather than as capital gains. The only facts submitted with regard to the second allegation of error were those pleaded in the petition and admitted in the answer, as follows: Under date of July 3, 1934, Petitioner executed and delivered to F. A. Ashby, as Lessee, an oil and gas lease covering part of the above mentioned land in Harris County, Texas. receiving in payment for said lease a bonus of $7,307.27; in her income tax return *143 for 1934 Petitioner reported and included said receipt of $7,307.27 but deducted therefrom as depletion 27 1/2% of said amount, to wit, $2009.48. There was no production of oil or gas on said land under the terms of said lease, and on or about the 23rd day of July, 1937, said lease was finally terminated. In the computation of the deficiency now complained of for the year 1937 Respondent has included as taxable income to Petitioner the sum of $2009.48 on account of the said depletion deduction taken by Petitioner in 1934. Petitioner did not include any part of said amount of $2009.48 in her return of taxable income for 1937. Opinion The first issue presented is whether the gains derived by the petitioner from the sale of lots in her Brownwood subdivisions during 1937, 1938 and 1939 are taxable as ordinary gains or as capital gains. This issue turns upon an application to the facts herein of the definition of "capital assets" contained in section 117 (b) of the Revenue Act of 1936, section 117 (a)(1) of the Revenue Act of 1938, and section 117 (a) (1) of the Internal Revenue Code. Petitioner contends that the lots sold were "capital assets," as defined in such sections, and the *144 gains therefrom taxable as capital gains; respondent has held that the lots are not "capital assets" because excluded from the definition of that term as "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The petitioner's argument, in brief, is that the land had not been acquired by her for subdivision; that the sale of the lots was not conducted as a business, for there was no office on the premises and there was no advertising program; that the purchasers were not ordinary customers, for they did not come to any established place of business but instead were sought out by the broker; and that, if the sale of the lots was a business, it was the broker's and not the petitioner's business, for she was not a business woman and the broker was not supervised and directed by her to such a degree as to justify a holding that he was her agent and it was her business. A consideration of these arguments in the light of the facts and the applicable authorities demonstrates their ineffectiveness. It is not material that the petitioner did not acquire the land for the purpose of subdividing it into lots. More relevant than the facts *145 of acquisition is that she subsequently subdivided the land and proceeded to sell the lots, doing whatever else was necessary to effectuate the sales. Neither is it material that there was no office on the premises and there was no advertising program. These are merely methods of getting buyer and seller together, and apparently they were not needed here, for petitioner quite successfully sold her lots frequently and continuously without them. The method which was used, one quite common in the real estate business, was for Montgomery to seek out and approach prospects. These prospects, when they made purchases, were none the less customers. In view of the facts, it can not be said that the lots sold in the taxable years were not property held for sale to customers in the ordinary course of business. Ehrman v. Commissioner, ( C.C.A., 9th Cir. 1941) 120 Fed. (2d) 607, certiorari denied 314 U.S. 668; J. R. Richards, 30 B.T.A. 1131, affd., Richards v. Commissioner, ( C.C.A., 9th Cir., 1936) 81 Fed. (2d) 369. It remains to determine whether the business was that of *146 petitioner. This she denies, arguing that she was not a business woman, had never had any business experience and did not supervise Montgomery's activities. Little need be said about these arguments. The type of business here involved was one in which the prime prerequisite was capital in the form of land. This petitioner had and she did not part with the title thereto until a sale had been consummated. Business experience was unnecessary for petitioner so long as competent people were placed in charge of the business. In this respect, at least, she showed good business judgment, for Montgomery appears to have been well chosen. As to Montgomery, it is clear from his testimony and petitioner's that the relationship between them in regard to the land was none other than that of principal and agent. They understood it to be such and acted accordingly. It is true that petitioner did not supervise and direct each detail of Montgomery's activities, but it can not be denied that she had the right to do so and exercised that right on occasion to the extent necessary to assure the continued success of the venture. Montgomery took no important step without consulting with petitioner or with *147 some member of her family upon whom she relied to determine general policy, and whose determination she ratified. All important papers were executed by petitioner or in her name, all funds were deposited in her bank account and all expenses were paid out of this account by checks signed by her. Montgomery's commissions were paid in the same manner as any other operating expense. From the manner in which the business was conducted it is clear that it was petitioner's business and that Montgomery was merely her agent in regard thereto. We hold, therefore, that, as determined by respondent, the lots sold by petitioner during the taxable years were not "capital assets" as defined in section 117 (b) of the Revenue Act of 1936, section 117 (a) (1) of the Revenue Act of 1938, and section 117 (a) (1) of the Internal Revenue Code. The gain realized is, therefore, taxable as ordinary and not as capital gain. Commissioner v. Boeing, ( C.C.A., 9th Cir., 1939) 106 Fed. (2d) 305, cert. denied 308 U.S. 619; Welch v. Solomon, ( C.C.A., 9th Cir., 1938) 99 Fed. (2d) 41; James Lewis Caldwell McFaddin, 2 T.C. 395; *148 and cases cited, supra. The second issue raised upon the pleadings is whether respondent properly restored to income for 1937 the amount of $2009.48, deducted by petitioner in 1934, as depletion upon bonus paid to her under an oil and gas lease, there having been no production under the lease and it having been terminated in 1937. It is well settled that under the circumstances here present the previously deducted depletion must be restored to income for the year in which the lease is finally terminated without production. J. T. Sneed, Jr., 40 B.T.A. 1136, affd. Sneed v. Commissioner, ( C.C.A., 5th Cir., 1941) 119 Fed. (2d) 767, certiorari denied 314 U.S. 686; Dolores Crabb, 41 B.T.A. 686, affd. Crabb v. Commissioner, ( C.C.A., 5th Cir., 1941) 119 Fed. (2d) 772, Clarion Oil Co., 1 T.C. 751, 758; Grace M. Barnett, 39 B.T.A. 864. We, therefore, hold for the respondent upon this issue. Decision will be entered for the respondent.