Harry F. Payer v. Commissioner.
Payer v. Commissioner
Docket No. 7701.
United States Tax Court
1946 Tax Ct. Memo LEXIS 65; 5 T.C.M. (CCH) 917; T.C.M. (RIA) 46239; October 8, 1946
Lloyd F. Loux, Esq., 1000 N.B.C. Bldg., Cleveland, Ohio. for the petitioner. W. W. Kerr, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion This proceeding involves deficiencies in income tax in the amounts of $4,061.37 for the calendar year 1940 and $544.41 for the calendar year 1941. The questions presented for decision relate only to the deficiency determined for the year 1940, and are whether a certain loss sustained by petitioner in 1940 was an ordinary loss or a long-term capital loss and whether petitioner should be allowed certain bad debt deductions claimed in his 1940 return. Findings of Fact The petitioner, an individual, is an attorney-at-law, residing and practicing in Cleveland, Ohio. He is the senior partner of a law firm in that city. On October 26, 1929, petitioner entered into an agreement with Frank W. Stanton with respect to some 200 acres of land located in Mantua Township, Portage County, Ohio, which petitioner *67 and Stanton had on the same day acquired from Cora B. Blair. The agreement with Stanton provided: 1st Said Frank W. Stanton and Harry F. Payer this 26th day of October, A.D. 1929, have had deeded to them by Cora B. Blair a farm of approximately two hundred (200) acres situated in the Village and Township of Mantua, County of Portage and State of Ohio, and known as being in Lots Thirty-Five (35) and Thirty-Six (36) of the Original Survey of Mantua Township. It is understood that said Harry F. Payer and Frank W. Stanton are now the equal owners thereof. 2nd As a material and persuading inducement said Stanton has represented to said Payer that said farm has cost him Forty-Four Thousand One Hundred and Forty Dollars ($44,140.00) at a cost of Two Hundred and Twenty-Five Dollars ($225.00) an acre, and that said Payer is acquiring an undivided half interest therein for a purchase price of Twenty-Two Thousand and Seventy Dollars ($22,070.00) or exactly one-half of what it has cost said Stanton - said purchase price being paid by said Payer to Stanton as follows: - Ten Thousand Dollars ($10,000.00) in cash represented by Cashier's Check of The National City Bank of Cleveland to Harry *68 F. Payer and by him endorsed to said Frank W. Stanton; Ten Thousand Dollars ($10,000.00) representing one-half of Mortgage Note in the sum of Twenty Thousand Dollars ($20,000.00) this day jointly executed by the said Frank W. Stanton and Harry F. Payer upon said farm to R. G. Dunning, the nominee of said Cora B. Blair; and Two Thousand and Seventy Dollars ($2,070.00) is represented by promissory note of even date herewith in said sum, payable two (2) years from the date hereof to said Frank W. Stanton by said Harry F. Payer. 3rd It is understood that in no event shall said one-half interest cost the said Payer more than Twenty-Two Thousand and Seventy Dollars ($22,070.00), but in the event said survey shows the acreage to be less than two hundred (200) acres or the said Frank W. Stanton has overestimated the cost of said farm, a proportionate adjustment and rebate shall be made in favor of said Harry F. Payer. 4th Said Stanton assures said Payer that said farm is free and clear of all incumbrances of any description and that said Payer is acquiring good title to the same. 5th It is also a material consideration of this agreement that said Stanton shall render his best services *69 in the development of said farm in the allotment and disposition of the same without any charge whatsoever, so that they may participate equally in the avails and proceeds thereof. 6th It is agreed that no expenditures shall be made thereon or in connection therewith without the full written acquiescence of said Payer; that no contracts for commissions or upon any other subject relating to said farm shall be made without the written consent of said Harry F. Payer, and that said Frank W. Stanton shall not dispose of his interest in said farm or incumber said interest in any manner whatsoever without the written consent of said Payer. 7th Money on hand for profit shall always be apportioned or distributed or applied or deposited to the satisfaction of said Harry F. Payer. Petitioner paid the $10,000 cash to Stanton and petitioner and Statton signed a mortgage note in the amount of $20,000 as joint obligors. Petitioner also made certain other payments in connection with the venture. Stanton was experienced in the development of real estate allotments and had handled about half a million dollars worth of real estate in such fashion in a nearby county. In due time the property *70 was allotted by an engineer and allotment plats were recorded in the office of the County Recorder. Some roadways were built, grading was done and paid for and several lots were sold. When the depression of the 1930's set in, the allotment enterprise came to a standstill and, by 1937, Stanton was unable or unwilling to make any further payments on his share of the investment due on the mortgage note. In 1936 or 1937 a suit on the mortgage note of $20,000 was instituted by the note holder, Cora B. Blair, in the Court of Common Pleas of Cuyahoga County, Ohio. It was then that petitioner discovered that Stanton had made gross misrepresentations to him with respect to the purchase price of the land and that instead of paying $44,120 for the 200 acres, Stanton had paid only some $19,000. Petitioner thereupon filed a cross-petition against Cora B. Blair and Stanton. The cause, after full trial, resulted in a judgment in favor of the petitioner in the amount of $20,942.62 against Mrs. Blair and Stanton, the judgment and decree being entered on January 25, 1938. The Court also ordered that the note and mortgage be of no validity, force and effect against the petitioner. The judgment and *71 decree of the Court of Common Pleas was appealed by Mrs. Blair and Stanton on the technical ground that the trial should have been to a jury and not to the Court. On appeal, the judgment and decree of the Court was reversed and the cause remanded for trial to a jury. After remand of the cause, the petitioner, faced with the possibility of a judgment against him in the amount of $20,000 on the mortgage note, entered into a settlement stipulation on June 3, 1940, with both Stanton and the representatives of Mrs. Blair, who had died during the litigation. Under the settlement, petitioner was released from all liability on the mortgage note, but the stipulation did not affect the lien and claim of Mrs. Blair's estate under the mortgage against the Mantua property. Petitioner, on his part, released the Estate of Cora B. Blair from all claims which he had against it and set forth in his aforementioned cross-petition. Petitioner also entered into an agreement with Stanton on June 3, 1940 whereby Stanton was to convey approximately 10 acres of land in Geauga County, Ohio, to petitioner which acreage was contiguous to an allotment owned by petitioner. In consideration of this coveyance, *72 petitioner agreed to release Stanton from all claims which he had against him in connection with the action instituted by Cora B. Blair and also to pay Stanton the sum of $2,000 to defray certain indebtedness on the 10 acres. Stanton failed to perform under this agreement. Petitioner did not receive any money consideration in the settlement with the Blair Estate and Stanton. While the Cuyahoga County action was pending, the Treasurer of Portage County, where the Mantua allotment property was located, instituted a suit in the Common Pleas Court of Portage County to foreclose on the property for the payment of taxes. The Portage County Court entered a decree of foreclosure on June 18, 1940, stating in the decree, inter alia, that the administrators of the Estate of Cora B. Blair had a lien on the property in the amount of $20,000 plus interest. Petitioner made no defense to the foreclosure action. Petitioner entered into the allotment venture with Stanton in 1929 for the purpose of engaging in the allotment business. Petitioner's interest in the Mantua property was held by him primarily for sale to customers in the ordinary course of his trade or business. The parties hereto have *73 stipulated that the amount of petitioner's loss in connection with the allotment venture, which terminated in 1940, was $13,284.05. In his income tax return for 1940 petitioner claimed deductions for certain bad debts arising out of loans made by him to various individuals named John Bauer, Sam B. Hiller, and Walter Vretman, respectively. Petitioner also claimed a similar deduction in that year in connection with a fee which had been advanced by his law firm to a Dr. Wells. These deductions have been disallowed by the respondent. The details of these transactions are as hereinafter stated. Petitioner lent the sum of $25.00 to a young man named John Bauer, a refugee, who came to his office with an introduction from a friend of the petitioner. Bauer represented that he was about to secure a job in Cleveland and being temporarily short of funds, asked for a loan of $25.00. The date when petitioner lent the money to Bauer is not shown. Petitioner never saw Bauer after making the loan and was unable to locate him in 1940 when he endeavored to do so. The persons who introduced Bauer to petitioner could not furnish any information as to his whereabouts. Petitioner had a friend named *74 Sam B. Hiller who was in his seventies and who was retired. Hiller was the beneficiary of a trust created by Henry Richman. On June 2, 1937, Hiller represented to petitioner that he was temporarily in need of funds and petitioner lent him $250. Petitioner obtained a cognovit note from Hiller dated June 2, 1937 and payable in three months from the date of execution. After the money was lent, Richman died and petitioner believed that the source of a large part of Hiller's income was thereby cut off. In 1940, Hiller became critically ill of cancer, which resulted in his death at some time after 1940, and in his inability to earn any money. Petitioner occassionally asked Hiller for a payment of this debt but Hiller always put him off. Petitioner thought that the state of Hiller's health was such that he would probably never be able to repay the loan. It is not shown that Hiller was insolvent in 1940. In October 1938, petitioner lent the sum of $250 to Walter Vretman and obtained a demand note dated October 4, 1938 from the latter. Vretman, once a very wealthy man, was a well-known citizen of Cleveland who had engaged in the real estate business. Petitioner had had business dealings with *75 him and had used him a number of times as an expert real estate witness in cases tried by petitioner. In requesting the loan, Vretman represented himself as being temporarily in need of funds. In 1940, Vretman had a heart attack from which he never recovered; he never left his room after the attack and died about two years later. After Vretman had the heart attack, petitioner visited him in 1940 and he advised petitioner concerning his financial status saying that it was considerably involved, that he had debts amounting to about $20,000 and requesting an additional loan from petitioner. For several years prior to 1940, petitioner and his office associates in the practice of law had frequently engaged a Dr. Wells, a practicing physician, as an expert witness. In 1938 or 1939, petitioner advanced $200 on fees to Dr. Wells. Wells then had marital difficulties and his wife sued him for divorce. She obtained a judgment for alimony against him and he left Cleveland in 1940. Petitioner was unable to get in touch with the doctor after he left the city. Petitioner represented Dr. Wells in the divorce proceedings and knew from his business relations with the doctor that the latter was insolvent *76 when he left Cleveland. Petitioner deducted the entire $200 as a bad debt in his individual return for 1940. In his 1940 return petitioner also claimed a bad debt deduction in the amount of $2,500 resulting from a transaction with one Jacob DcKaiser, which deduction was disallowed by the respondent. At the hearing of this proceeding the parties stipulated that petitioner shall be allowed a bad debt deduction in the amount of $1668.67 in connection with the DeKaiser transaction. Respondent determined a deficiency of $544.41 in petitioner's return for the calendar year 1941. Inasmuch as petitioner has not challenged this determination, it must be presumed that petitioner concedes the correctness of this deficiency for the year 1941, and the respondent's determination for 1941 is sustained. Opinion KERN, Judge: The first question for consideration is whether the loss of $13,284.05 is deductible in full as an ordinary loss in the computation of petitioner's 1940 taxable income, or whether it is deductible only in part as a capital loss. The pertinent provisions of the Internal Revenue Code and of Regulations 103 are set forth in the margin. [1]
*77 Petitioner can deduct this sum as an ordinary loss if he qualifies under section 23 (e) of the Code. However, if this loss resulted from the sale or exchange of a capital asset only 50 percent of the loss will be recognized by reason of the provisions of sections 23 (g) and 117, supra. Our decision, therefore, returns on whether petitioner's interest in the Mantua property was a capital asset. Section 117 (a) (1) provides that "the term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *." We think it clear that petitioner's interest in the Mantua property was not a capital asset within the meaning of section 117 (a) (1), supra, since it was property held by petitioner primarily for sale to customers in the ordinary course of his trade or business. Richards v. Commissioner, 81 Fed. (2d) 369, affirming 30 B.T.A. 1131; Welch v. Solomon, 99 Fed. (2d) 41; Snell v. Commissioner, 97 Fed. (2d) 891; Ehrman v. Commissioner, 120 Fed. (2d) 607, *78 cert. denied 314 U.S. 668; Brown v. Commissioner, 143 Fed. (2d) 468; A. R. Calvelli, 43 B.T.A. 6; Neils Schultz, 44 B.T.A. 146. Petitioner and Stanton did not acquire the land with the purpose of holding it for some indefinite period and then selling it as a whole or as acreage in its undeveloped state. From the very inception of the venture, petitioner clearly had the purpose of engaging in the allotment business and realizing profit from the sale of lots. He associated himself with an individual experienced in this business, and they promptly took the customary steps to allot and develop the property - having allotment plats prepared and recorded, building roads and grading the land. Some lots were actually sold and it appears that their continued sale was interrupted only by the business depression of the 1930's. Petitioner at or about the same time was engaged in another allotment enterprise in another Ohio County. The fact that petitioner was also engaged in the practice of his profession, and undoubtedly devoted the greater part of his attention to it, did not preclude him from engaging in another distinct business, namely, *79 the allotment ventures. Snyder v. Commissioner, 295 U.S. 134, 139; Oliver v. Commissioner, 138 Fed. (2d) 910; Richards v. Commissioner, supra; Snell v. Commissioner, supra; and Ignaz Schwinn, 9 B.T.A. 1304, 1308. Petitioner probably relied heavily, if not entirely, on Stanton to do the actual work of developing the Mantua property and selling the lots, but this does not prevent petitioner from holding his interest in the property primarily for sale to customers in the ordinary course of his trade or business. "The personal attention which a taxpayer gives to a business is certainly not decisive as to whether a resulting profit is ordinary income or capital gain. One may conduct a business through others, his agents, representatives, or employers. The business is none the less his because he chooses to let others bear all the burdens of management." Welch v. Solomon, supra, at p. 43. See also Snell v. Commissioner, supra. Respondent urges that even assuming that petitioner and Stanton originally intended to make the allotment their business, they completely abandoned the idea in 1930 and *80 as a natural consequence thereof the property from 1930 to 1940 was not held "primarily for sale to customers in the ordinary course of his trade or business". The evidence does not bear out respondent's contention. Petitioner and Stanton entered into the allotment venture in 1930 and there has been no proof that they abandoned their purpose of developing the property and selling lots. The fact that few if any lots were sold after 1929 does not justify a finding that they abandoned their purpose. The depressed business conditions of the decade beginning in 1930 are of too recent and vivid memory to warrant our closing our eyes to the realities of the situation. To desire to sell real estate is one thing, but to find a buyer willing and able to pay a fair price is a difficult if not well-nigh impossible task in times of acute business depression. Harriss v. Commissioner, 143 Fed. (2d) 279; Ben L. Carroll, 21 B.T.A. 724; and Albert F. Keeney, 17 B.T.A. 560, relied upon by respondent, are clearly distinguishable. Both the Harriss and Carroll cases involved situations where the taxpayer had acquired property for investment purposes and made no *81 efforts to sub-divide and improve the property for allotment purposes. The inapplicability of the Keeney case to the problem here before us is readily apparent when we consider the fact that there the Board of Tax Appeals made a specific finding that the taxpayer had acquired the land in question, which was farm land on the northwest side of the city of Chicago, with the intention of holding it. In its opinion the Board stated: "* * * He [the taxpayer] made his purchases without any well defined idea of what he was going to do with the property. He bought farm acreage and, if he had any plan at all, it was with the expectation of disposing of it as acreage when its value had increased through the normal growth of the city. * * * Naturally, his purchase was made 'for profit', which he hoped to achieve in some way not at all clear to him at the time that the purchases were made; but it was not his purpose to, nor did he, sell the property for any price that he could get above its cost to him. He intended to hold it, and did hold it, until, in 1923, he was able to dispose of it at a price that justified his faith in the growth of Chicago at the time the purchase was made, and the soundness *82 of his judgment in regard to the direction in which the city would expand * * *." Since petitioner's interest in the Mantua property was not a capital asset, his entire loss of $13,284.05 was deductible as an ordinary loss in 1940 under the provisions of section 23 (e) of the Code. In view of the conclusion which we have reached, we need not consider petitioner's alternative contention that he should be allowed to deduct the full amount of this loss as a bad debt in 1940. Also, since we have held that the property in question was not a capital asset in the hands of the petitioner in 1940, it will be unnecessary for us to discuss respondent's further argument that the settlement transaction in 1940 amounted to a "sale or exchange" of a capital asset by the petitioner within the meaning of section 117 (a) (5) of the Internal Revenue Code. The final matter for consideration is whether petitioner should be allowed to deduct as bad debts in his 1940 return, the various debts owed him by John Bauer, Sam B. Hiller, and Walter Vretman, respectively. Also, should petitioner be allowed to take a bad debt deduction of $200 in 1940 as a result of the advance to Dr. Wells? *83 The deduction for bad debts in the computation of net income is provided for in section 23 (k) of the Internal Revenue Code as amended by section 124 of the Revenue Act of 1942 and by section 113 of the Revenue Act of 1943. The applicable statute and regulations are set forth below. [2] Under the statute, as amended, the requirement of ascertainment by the taxpayer is no longer a factor in bad debt deductions. The real question now is whether or not the debt has become worthless within the taxable year. See Mertens, Law of Federal Income Taxation, §§ 30.01, 30.27, 30.27a, 1945 Supp. See also Redman v. Commissioner, 155 Fed. (2d) 319, and Edward G. Janeway, 2 T.C. 197, 201, affirmed 147 Fed. (2d) 602, The question for decision here, therefore, is whether each of the debts became worthless in 1940.
*84 The indebtedness of John Bauer to petitioner may not be properly deducted as a bad debt by petitioner in 1940. The evidence adduced on this issue does not prove that it became worthless in 1940. In fact, the record does not prove that it was ever collectible. Petitioner determined that the debt owed him by Walter Vretman was worthless and uncollectible in 1940. The state of the debtor's health, his statement to petitioner as to his financial condition, and his request for an additional loan from petitioner, warrants a conclusion that the debt became worthless in 1940, and accordingly, the deduction should be allowed. Petitioner's deduction of the debt owed him by Sam Hiller is not allowable. Hiller had been the beneficiary of a trust fund. Petitioner believed that a large part of Hiller's income was cut off when the settlor of the trust died. However, there is no evidence that petitioner made any investigation to ascertain whether his belief was well-founded and whether the debtor had any other income or assets. Insofar as the record shows Hiller may well have been entirely solvent in 1940 and at the time of his death. A creditor's belief that a debtor is in bad financial condition *85 is not evidence of worthlessness. American Foundry Co., 11 B.T.A. 575. In determining that the Hiller debt was worthless, petitioner relied only on the bad state of the debtor's health and apparently made no actual inquiry into his financial status. In determining that Vretman's debt was bad, petitioner not only considered the debtor's illness but also had made some inquiry into his financial condition. We are of the opinion that respondent's disallowance of the bad debt deduction based on the advance to Dr. Wells must be overruled. The evidence indicates to our satisfaction that the Wells indebtedness became worthless during the taxable year. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - (1) if incurred in trade or business; or (2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or * * *
(g) Capital losses. - (1) Limitation. - Losses from sales or exchanges of capital assets shall be allowed only to the extent provided in section 117. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *
(5) Long-term Capital Loss. - The term "long-term capital loss" means loss from the sale or exchange of a capital asset held for more than 18 months, if and to the extent such loss is taken into account in computing net income; * * *
(b) Percentage Taken Into Account. - In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net income: 100 per centum if the capital asset has been held for not more than 18 months; 66 2/3 per centum if the capital asset has been held for more than 18 months but not for more than 24 months; 50 per centum if the capital asset has been held for more than 24 months. Regulations 103 Sec. 19.23(e)-1. Losses by Individuals. - Losses sustained by individual citizens or residents of the United States and not compensated for by insurance or otherwise are fully deductible if (a) incurred in the taxpayer's trade or business, or (b) incurred in any transaction entered into for profit. * * * In general losses for which an amount may be deducted from gross income must be evidenced by closed and completed transactions, fixed by identifiable events, bona fide and actually sustained during the taxable period for which allowed. Substance and not mere form will govern in determining deductible losses. Full consideration must be given to any salvage value and to any insurance or other compensation received in determining the amount of losses actually sustained. * * * Sec. 19.117-1. Meaning of Terms. - The term "capital assets" includes all classes of property not specifically excluded by section 117(a)(1). In determining whether property is a "capital asset," the period for which held is immaterial. The exclusion from the term "capital assets" of property used in the trade or business of a taxpayer of a character which is subject to the allowance for depreciation provided in section 23(1) is limited to property used by the taxpayer in the trade or business at the time of the sale or exchange. It has no application to gains or losses arising from the sale of real property used in the trade or business to the extent that such gain or loss is allocable to the land, as distinguished from depreciable improvements upon the land. To such gain or loss allocable to the land the limitations of sections 117(b), (c), and (d)↩ apply (such limitation may be inapplicable to a dealer in real estate, but, if so, it is because he holds the land primarily for sale to customers in the ordinary course of his trade or business, not because land is subject to a depreciation allowance). * * *
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * * * *
(k) Bad Debts. - (As amended by § 124 of the Rev. Act of 1942 and by § 113 of the Rev. Act of 1943) (1) General Rule. - Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt in an amount not in excess of the part charged off within the taxable year as a deduction. * * * Sec. 19.23(k)-1. (As amended by T.D. 5234 and T.D. 5376) Bad Debts. - ( a) Bad debts may be treated in either of two ways - (1) By a deduction from income in respect of debts which become worthless in whole or in part, or (2) By a deduction from income of an addition to a reserve for bad debts. Taxpayers were given a similar option for 1921 to select either of the methods mentioned for treating such debts. (See article 151, Regulations 62.) While ascertainment of worthlessness and charge-off during the taxable year (which were prerequisite to deduction of a bad debt under the law at that time) are no longer required for the allowance of a debt which becomes wholly worthless in a taxable year beginning after December 31, 1938, the method used in the return for 1921 must be used in returns for all subsequent years unless permission is granted by the Commissioner to change to the other method. * * * (b) If, from all the surrounding and attending circumstances, the Commissioner is satisfied that a debt is partially worthless, the amount which has become worthless, to the extent charged off during the taxable year, shall be allowed as a deduction in computing net income.if a taxpayer claims a deduction for a part of a debt for the taxable year within which such part of the debt is charged off and such deduction is disallowed for such year and the debt becomes partially worthless subsequent to such year, a deduction may be allowed for a subsequent taxable year, not in excess of the amount charged off in the prior year plus any amount charged in the subsequent year, the charge-off in the prior year, if consistently maintained as such, being sufficient to that extent to meet the charge-off requirement. Before a taxpayer may deduct a debt in part, he must be able to demonstrate to the satisfaction of the Commissioner the amount thereof which is uncollectible and the part thereof which was charged off. If a debt becomes wholly worthless during the taxable year, the amount thereof which has not been allowed as a deduction for any prior taxable year shall be allowed as a deduction for the taxable year. There should accompany the return a statement of facts substantiating any deduction claimed for bad debts. * * * Where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for the purpose of deduction. Bankruptcy is generally an indication of the worthlessness of at least a part of an unsecured and unpreferred debt. * * *↩