JOSEPH M. PHILBIN AND JANE M. PHILBIN, HIS WIFE, ET AL., PETITIONERS,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 57155–57160.   Filed September 21, 1956.

*John J. Cullom, Esq.*, for the petitioners.
*J. Bruce Donaldson, Esq.*, for the respondent.

---

[1] The following proceedings are consolidated herewith: John J. Cullom and Jewell A. Cullom, his wife, Docket Nos. 57156, 57160; and Richard X. Zimmermann, Docket Nos. 57158, 57159.

1160

² For reasons which do not appear in the record, Philbin's share of the profits was slightly larger than the other petitioners' for the year 1952.

**OPINION.**

MULRONEY, *Judge:* The first issue in these consolidated cases is whether the profit realized by the petitioners from the sale of vacant lots in the city of Chicago in 1951 and 1952 is taxable as long-term capital gain or as ordinary income. Petitioners contend that the vacant lots were bought with "surplus funds" as long-term investments; that they were capital assets which were held for more than 6 months and therefore the profit realized from their sale should be given long-term capital gains treatment under section 117 (a) (1), Internal Revenue Code of 1939. Respondent determined that the vacant lots were held by the taxpayers primarily for sale to customers in the ordinary course of their trade or business as defined in the exclusion from capital assets in section 117 (a) (1).

The issue is essentially one of fact. *D. L. Phillips*, 24 T. C. 435. We are of the opinion that the petitioners have failed in their burden of proving that the lots in question were held primarily for investment and not for sale to customers in the ordinary course of their trade or business. Numerous cases involving this issue have been decided. These cases have adopted many criteria or tests which are of aid in determining the issue. No single test, however, is decisive and the question must be viewed in the light of all pertinent factors and particularly the facts of the individual case. *Boomhower* v. *United States*, 74 F. Supp. 997. We said in *W. T. Thrift, Sr.*, 15 T. C. 366, at page 369:

The governing considerations have been the purpose or reason for the taxpayer's acquisition of the property and in disposing of it, the continuity of sales or sales related activity over a period of time; the number, frequency, and substantiality of sales, and the extent to which the owner or his agents engaged in sales activities by developing or improving the property, soliciting customers, and advertising.

Petitioner Joseph M. Philbin, who was the only witness at the trial, testified that he was a lawyer, admitted to practice in the State of Illinois in 1938. In 1947 he opened a real estate and law office at 7340 S. Western Avenue, Chicago, Illinois. He was joined in a law partnership sometime during 1950 by petitioner Richard X. Zimmermann, and in 1951 by petitioner John J. Cullom, both of whom are also licensed to practice law in Illinois.

Philbin testified that he was "actively" in the real estate business from 1947 through part of 1950, but that since that date had not been in such business, though he admitted that he had received some realty brokerage commissions since that date. Philbin's name was listed in the Chicago telephone directory under the heading "Real Estate" from 1947 to the date of the hearing. He acquired a real estate broker's license in 1947 and has kept the license current. The office from which the petitioners worked and carried on their law partnership at all times, and which is in close proximity to many of the lots sold in 1951 and 1952, was virtually covered with signs of all descriptions advertising to the world that therein the petitioners also carried on a real estate business.

Prior to the formation of the law partnership, the petitioners began to jointly purchase and sell real estate. In 1949, they purchased 50 vacant lots and sold 13; in 1950, they purchased 39 lots and sold 37; in 1951, they purchased 50 lots and sold 47; and in 1952, they purchased 53 lots and sold 47. All of the lots purchased and sold, before and after the law partnership was formed, were jointly purchased, expenses were shared, and profits divided equally.[3]

The petitioners contend that their purchases of vacant lots were made from surplus funds, and were intended to be long-term investments; that they were forced to sell or "be left holding the bag" investmentwise. We note, however, that at the same time the petitioners were "liquidating" their investment in 47 lots during 1951, they were purchasing 50 others, some of which were in the same subdivision; and while selling 47 lots in 1952, they were purchasing 53 more. While the petitioners' stated intention at the time of acquisition should be considered, the ultimate question of decisive consequence is the purpose for which the lots were being held at the time of the sales. *Friend* v. *Commissioner*, 198 F. 2d 285; *Mauldin* v. *Commissioner*, 195 F. 2d 714 (C. A. 10, 1952), affirming 16 T. C. 698. We also note that the lots sold in 1951 and 1952 were retained by the petitioners on an average of less than a year. We think that these facts are inconsistent with the contentions of the petitioners that they were liquidating an investment so as not to be left "holding the bag" investmentwise.

---

[3] For some unexplained reason, Philbin's share of profits from the sale of lots in 1952 was slightly larger than that of the other two petitioners.

Petitioners argue that they did not advertise, place "For Sale" signs on the property, hire agents, solicit customers, list the property with realtors, or make improvements thereon. They also argue that their sales were infrequent, sporadic, and lacking in continuity.

We have held many times that it is not necessary to advertise or solicit customers where an active seller's market exists. *Arthur E. Wood*, 25 T. C. 468; *Mauldin* v. *Commissioner, supra*. Advertising is especially unnecessary when, as here, a few construction companies and building contractors do most of the buying. It did not require advertising for repeat customers to know that the petitioners were in the business of buying and selling vacant lots. It appears also that Philbin grew up in the neighborhood of his office and had contacts there prior to the time that he opened his office. Even conceding that advertising is a necessary element to this issue, we feel that the petitioner's own testimony indicates sufficient advertising. The fact that the 1-story building in which petitioners worked was completely covered with advertising; the fact that partner Philbin's name was listed under "Real Estate" in the telephone directory; and the close proximity of their office to the majority of the lots sold constitute sufficient advertising in a buyer's market such as existed in Chicago in 1951 and 1952.

While petitioners made no physical improvements on the property bought and sold, they did expend time, energy, and professional skills in removing liens against the property to render their commodity more easily marketable at a higher price. The procedure used by the petitioners required from 4 months to a year to complete. Removal of such liens to improve marketability of title have been held to be "fully as important as improvement of the land itself through subdivision, grading, or street installation; and they involve similar use of skill, capital, and business activity." *J. Roland Brady*, 25 T. C. 682.

We think that the record shows conclusively that purchases and sales by petitioners were not infrequent and sporadic but were continuous and substantial from 1949 through the tax years 1951 and 1952. Whether property is purchased for sale or for investment depends upon the number and proximity of purchases and sales to one another. *Harriss* v. *Commissioner*, 143 F. 2d 279, affirming 44 B. T. A. 999. At the same time the petitioners were selling lots, they were busy acquiring others, indicating a going business. In the tax years involved, 1951 and 1952, the net profit from the sale of lots to the petitioners was $93,222.95. During the same period, their net profit, or the total of their reported net distributive shares from the practice of law, was $20,893.78. We think that the sales, and profits therefrom, were substantial by any comparison.

That the petitioners were lawyers does not preclude their engaging in another business. *Friend* v. *Commissioner, supra*. In the *Boom-*

*hower* case, *supra*, upon which the petitioners rely heavily, an attorney was upheld in claiming long-term capital gain upon the sale of lots. There are several distinguishing features between the cited case and the instant case. The taxpayer, an attorney, in the *Boomhower* case, individually purchased a tract of 20 acres from a trust in 1936, after he, as trustee, had made a bad investment in the tract for the trust. The court stated of the taxpayer: "It is apparent that the tract was acquired by him out of a sense of responsibility to the trust, * * * to relieve the trust of an undesirable asset." In addition to the manner in which the taxpayer acquired the property involved, there are other distinguishing features. The taxpayer was unable to sell the property for a number of years and then sold only 8 lots in the 2-year period involved. Prior to this time he had never been in the real estate business; he did not hold himself out to the public as being a dealer in real estate; he made no further purchases of real estate after selling began; and his profits from the sale of these lots constituted an insignificant part of his income for the years in question. These features completely distinguish the instant case from the *Boomhower* case, *supra*. The other cases cited by the petitioners have many of the same distinguishing features. In *Dunlap* v. *Oldham Lumber Co.*, 178 F. 2d 781 (C. A. 5, 1950), the taxpayer, a $300,000-a-year corporation, acquired 50 vacant lots in 1928, sold 16 lots between 1928 and 1944, 27 lots in 1944, and 7 in 1945. No purchases for the purpose of sale were made after 1928. In *Fahs* v. *Crawford*, 161 F. 2d 315, the taxpayer, an attorney, made a single purchase in 1925 of a complete subdivision, held the property for 15 years, qualified it for Federal Housing Administration loans so that it would sell, and then accepted the purchase price and executed deeds therefor as it was purchased or sold by a real estate broker under an exclusive commission contract.

We conclude from a careful analysis of all the evidence that the petitioners held the lots which were sold in 1951 and 1952 primarily for sale to customers in the ordinary course of a business. The petitioners were dealers in vacant lots and gains derived from the sale thereof are taxable as ordinary income.

The second issue is whether the income realized upon the sale of the lots is self-employment income and therefore subject to the tax provided in sections 480 and 481, Internal Revenue Code of 1939. The sections were added to chapter 1 of the Internal Revenue Code relating to income taxes. We have jurisdiction over all taxes levied under chapter 1. Sec. 272, 1939 Code. The tax imposed is "an additional tax on the income derived by the self employed [taxpayer] as an employee." *Cain* v. *United States*, 211 F. 2d 375, certiorari denied 347 U. S. 1013. Petitioners argue the income here is within

the exclusion of section 481 (a) (4) in that the income is "gain * * * from the sale * * * of a capital asset, * * *." This argument is foreclosed by our holding above that the income is ordinary income. Petitioners next argue that lawyers are exempt from this tax under section 481 (c) (5), 1939 Code. The section does exclude from the payment of this tax all net earnings gained from the performance of service by an individual "in the exercise of his profession as a * * * lawyer, * * *." Here, we have determined that the sale of lots by petitioners was not in the exercise of their profession as lawyers, but was a separate and individual business. They are therefore required to pay this tax, not as attorneys, but as real estate dealers.

*Decisions will be entered for the respondent.*