**WILLIAM E. STARKE AND CECILIA G. STARKE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.**

Docket No. 70249. Filed October 7, 1960.

*Robert E. Austin, Esq.*, and *Wendell H. Davis, Esq.*, for the petitioners.

*Eugene F. Reardon, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax and additions to tax for substantial underestimation or underpayment of estimated tax for the taxable years 1953, 1954, and 1955 as follows:

| Year | Deficiency | Additions to tax | |
|---|---|---|---|
| | | Sec. 294(d)(2), I.R.C. 1939 | Sec. 6654, I.R.C. 1954 |
| 1953 | $9,409.14 | $858.88 | |
| 1954 | 5,544.52 | 426.95 | |
| 1955 | 3,529.85 | | $90.33 |

The petitioners concede they are liable for additions to tax under the above sections of the Internal Revenue Codes of 1939 and 1954. The sole issue remaining for decision is whether gain from the sale of real estate lots by petitioners in the years 1953, 1954, and 1955 is taxable as ordinary income as determined by the respondent or as long-term capital gain as contended by the petitioners.

FINDINGS OF FACT.

Some of the facts are stipulated and are incorporated herein by this reference.

The petitioners are husband and wife residing in San Diego, California. They filed joint income tax returns for the years 1953, 1954,

and 1955 with the district director of internal revenue at Los Angeles, California. Since Cecilia G. Starke is involved herein solely because the income in question is community income under the laws of California and because she and her husband filed joint returns for the years 1953, 1954, and 1955, William E. Starke will hereinafter be referred to as petitioner.

Petitioner is an attorney and has been actively and continuously engaged in the private practice of law in San Diego, California, since 1936. From 1937 to 1951 he practiced law in partnership with Solon S. Kipp. For approximately 10 years prior to 1937 petitioner was the chief redemption clerk in the office of the county auditor in San Diego. During that employment he became familiar with tax deeds, street improvement bonds, quitclaim deeds, and other aspects of acquiring title interests in real estate and is considered an expert in this field. He is familiar with property in San Diego and it was not necessary for him to actually view particular property to know its location and character.

In 1930 or 1931 the petitioner commenced acquiring title to real estate lots in San Diego County through the acquisition of street improvement bonds. Title to the underlying lots was obtained either by quitclaim deeds from the property owners, by foreclosure pursuant to the provisions of the bonds, or by payment of delinquent taxes and the receipt of tax deeds. In some instances he purchased tax deeds outstanding against lots in which he had acquired an interest through ownership of street bonds, thus perfecting his title. Street improvement bonds were issued under the circumstances described hereinafter. San Diego property owners desirous of having streets adjacent to their properties paved and otherwise improved would file petitions with the San Diego City Council. If a petition was supported by more than 50 per cent of those whose property was adjacent to the streets to be improved, the city council would approve the project and direct the city engineers to furnish plans and specifications for the improvements. The city council would then award a contract to the contractor making the lowest bid. After the contractor had finished his work, the city council would apportion the cost of the improvements to the various properties benefited and the amount apportioned was assessed against each property. The contractor would then send bills to the various property owners. If payment was not made within 30 days, the contractor would report the delinquency to the city council and request and receive a street improvement bond in the amount of the assessment in each such case. The bond was issued and payable to the bearer, the amount thereof was payable in installments over a 10-year period, it bore interest at the rate of 6 per cent per annum, it

constituted a lien on the property, and was salable on the open market. The interest was exempt from income tax.

If a property owner failed to meet any installment of principal or interest when due, the owner of the bond had the right to force a judicial sale of the property for the amount of the bond and the interest due thereon.

Contractors usually obtained three legal opinions in connection with a particular contract, one when the original contract was awarded, one when the paving work was completed, and one when delinquency occurred and the contractor requested the issuance of street improvement bonds. The petitioner wrote approximately 90 per cent of these legal opinions in San Diego County, and in this connection traveled to all the cities in the county.

Contractors sometimes sold the bonds issued to them. The petitioner knew of the availability of bonds for sale through his connection with the contractors and through his legal representation of several bond buyers and investment houses. Such contractors and investment houses would advise him of such availability. He purchased many such bonds from contractors and received many in payment of legal fees due from contractors. Upon acquisition of such bonds the petitioner made no title search with respect to the properties since the amount of the bond constituted a first lien on the property on a parity with the lien for local taxes.

The petitioner also obtained part interests in street bonds through the purchase thereof with others, each furnishing his proportionate share of the money. He purchased such bonds in ventures with Kipp, in which he received a 50 per cent interest, in ventures with Kipp and Kenneth Mark, in which he received a 33⅓ per cent interest, and in ventures with Kipp and Joseph Schreve, in which he received a 25 per cent interest.

Kenneth Mark represented the Griffith Company, a Los Angeles paving contractor doing street-paving work in San Diego, and in that connection made surveys of street improvements on which the Griffith Company proposed to submit bids. The petitioner also represented the Griffith Company in hundreds of street bond foreclosures. Mark has had a real estate license in California for many years.

Schreve was the sole owner of the Michigan Mortgage Company and the Eagle Investment Company. The business of these two companies included the making of various investments, including investments in real estate, issuance of insurance, and the purchasing and selling of street bonds and interests in real estate. Schreve acted as an adviser

on investments in real property and in the stock market. The two companies had held real estate licenses in California for many years.

The petitioner never sold any of the street improvement bonds which he acquired, although sometimes he would exchange some for other improvement bonds on properties in which he already had some interest.

The petitioner individually, and he and the other joint venturers, generally acquired the fee interest in the properties against which they held street bond liens through foreclosure and judicial sale by bidding the amount of the judgment plus the cost of the judicial sale and taking the property in satisfaction of the judgment. However, they sometimes acquired title to properties on which they held street bonds through the payment of delinquent taxes owed on the properties and the receipt of tax deeds. In this latter manner they were able to obtain a fee interest immediately rather than wait for a delinquency in payment under the bonds; this would also preclude anyone else from obtaining a part interest in the property through payment of delinquent taxes. Also in the case of many of the bonds which were delinquent, they found it more advantageous to obtain title by payment of the delinquent taxes. With respect to many of such properties, the petitioner and his coventurers were able to reach an agreement with the taxing officials to pay a flat sum per lot, in lieu of the greater amount of taxes due, and thus were able to obtain title to the underlying properties at a lower cost.

All of the real estate lots acquired by the petitioner, as above described, were unimproved lots and petitioner did not thereafter improve them in any way. The petitioner continued to acquire street bonds through the years up to the time of the hearing. However, after 1953 his acquisitions of titles to lots through the payment of delinquent taxes ceased because taxes were too high.

The petitioner did not commence to sell any of the real estate lots which he had acquired, as described above, until about 1941. At that time due to World War II, large aircraft factories were located in the area, which, together with the fine climate, attracted a large population. As a consequence the demand for property increased and the petitioner continued to sell lots from then on, including the years in question. Although his sales of lots were relatively few in the years 1948, 1949, 1950, and 1951, the average number of lots which he sold annually over the period from 1941 through 1952 was as great as the number sold in each of the years in question. The greatest increase in prices and demand for lots occurred in the middle of 1952.

Sales in which petitioner had an interest were made during the years 1953 to 1956, inclusive, as follows:

| Petitioner's interest | Year acquired 1953 | Number of lots | Number of sales |
|---|---|---|---|
| 100 per cent interest | 1931 | 16 | |
| | 1943 | 1 | |
| | 1945 | 11 | |
| | 1946 | 8 | |
| | 1947 | 15 and 2 sec. | |
| | 1948 | 4 | |
| | 1950 | 1 | |
| | 1952 | 6 | |
| | | 64 | 45 |
| ½ interest in Kipp and Starke venture | 1939 | 17 | |
| | 1941 | 3 | |
| | 1944 | 1 | |
| | 1948 | 2 | |
| | | 23 | 5 |
| ⅓ interest in Kipp, Starke, and Mark venture | 1946 | 6 | |
| | 1947 | 9 | |
| | | 15 | 4 |
| ¼ interest in Kipp, Starke, and Schreve venture | 1945 | 20 | |
| | 1946 | 17 | . |
| | | 37 | 14 |
| Total | | 139 | 68 |
| | 1954 | | |
| 100 per cent interest | 1941 | 1 sec. | |
| | 1946 | 12 and 1 sec. | |
| | 1947 | 17 | |
| | 1949 | 4 | |
| | 1951 | 1 | |
| | 1952 | 23 | |
| | 1953 | 20 | 33 |
| | | 79 | |
| ½ interest in Kipp and Starke venture | 1944 | 1 | 1 |
| ⅓ interest in Kipp, Starke, and Mark venture | 1946 | 1 | |
| | 1947 | 5 | |
| | | 6 | 5 |
| ¼ interest in Kipp, Starke, and Schreve venture | | 3 | 2 |
| Total | | 89 | 41 |

| Petitioner's interest | Year acquired 1955 | Number of lots | Number of sales |
|---|---|---|---|
| 100 per cent interest | 1931 | 15 | |
| | 1941 | 1 sec. | |
| | 1945 | 1 | |
| | 1946 | 3 and 1 sec. | |
| | 1947 | 17 | |
| | 1949 | 1 | |
| | 1951 | 6 | |
| | 1953 | 1 | |
| | 1954 | 1 | |
| | | 46 | 20 |
| ½ interest in Kipp and Starke venture | 1946 | 2 | 1 |
| ⅓ interest in Kipp, Starke, and Mark venture | 1942 | 1 | |
| | 1947 | 5 | |
| | 1948 | 1 | |
| | | 7 | 2 |
| ¼ interest in Kipp, Starke, and Schreve venture | 1930 | 2 | |
| | 1953 | 2 | |
| | | 4 | (1) |
| Total | | 59 | 23 |
| | 1956 | | |
| 100 per cent interest | 1931 | 3 | |
| | 1941 | 1 sec. | |
| | 1942 | 1 sec. | |
| | 1943 | 20 | |
| | 1946 | 7 sec. | |
| | 1947 | 2 | |
| | 1948 | 2 | |
| | 1950 | 1 sec. | |
| | 1951 | 8 | |
| | 1952 | 10 | |
| | 1953 | 2 | |
| | 1955 | 2 | |
| | 1956 | 14 | |
| | | 73 | 20 |
| ½ interest in Kipp and Starke venture | 1946 | 2 | 1 |
| ⅓ interest in Kipp, Starke, and Mark venture | 1941 | 1 | 1 |
| ¼ interest in Kipp, Starke, and Shreve venture | 1946 | 4 | 3 |
| Total | | 80 | 25 |

[1] Not known.

The above summaries reflect only those sales made in the years 1953, 1954, and 1955. In addition, the petitioner received during those years profits from installment sales made in prior years. To illustrate, petitioner received profits during 1953 from 81 installment sales made prior to 1953.

During the years here involved the petitioner received income from various sources as follows:

| Year | Gross receipts from law practice | Net income from law practice | Profit from sales of interest in real estate | Interest income from trust deeds, etc. | Income from rentals |
|---|---|---|---|---|---|
| 1953 | $19,279.43 | $7,669.20 | $33,237.76 | $3,930.38 | $598.00 |
| 1954 | 18,101.90 | 6,289.80 | 21,246.13 | 3,302.59 | 3,457.58 |
| 1955 [1] | 31,406.80 | 19,274.52 | 13,220.57 | 3,996.42 | 1,639.57 |

[1] Petitioner had a gain on the sale of stock during 1955 in an amount of $2,836.29 and also incurred a loss on the sale of stock during 1955 in an amount of $1,012.66

Petitioner also received income from dividends during 1953, 1954, and 1955 in the amounts of $258.75, $690.50, and $90, respectively.

The petitioner did not maintain any office other than his law office. Substantially all of his time was devoted to his law practice. He did not personally do anything toward solicitation of purchasers of his lots, nor did he employ any agents or brokers to sell any of the real estate. None of the lots was advertised. All sales were made as a result of inquiries by prospective purchasers and real estate agents. Most inquiries were made by telephone, although sometimes prospective purchasers came to petitioner's office. Persons who became interested in a particular lot would make inquiry at a title company or at the tax office and upon learning that a particular lot was owned by the petitioner, would contact him. All properties in which the petitioner had an interest were listed on the tax rolls under his name or under his and the other venturers' names. If anybody made inquiry and made an offer which the petitioner considered fair he would sell. Actually it was not necessary to seek prospective purchasers in the years in question since there were many prospective purchasers who contacted petitioner in the manner above described.

The petitioner performed all the legal work required in connection with the acquisition and sale of lots, which included the perfecting of title either through foreclosure or through acquisition of tax deeds and the preparation of deeds transferring property. The secretary employed by petitioner in his law office prepared all the paperwork required. The petitioner deducted her entire salary as a business expense of his law office. With respect to lots acquired by petitioner jointly with Mark or Schreve as described above, petitioner performed all the legal services necessary in connection with the properties with-

out charge and in return Mark and Schreve handled the sales of the properties in which each had an interest.

Petitioner maintained in his law office five record books in connection with his real estate. One book contained a list of street bonds, the second listed the real estate property acquired by foreclosure, quitclaim, or tax deed, the third contained a list of trust deeds with the name of the trustor, the fourth listed rental properties, and the fifth listed cash assessments.

Mark and Schreve also kept books similar to petitioner's included in which were listed the lots in which they and the petitioner jointly owned interests.

Petitioner in his income tax returns for the years 1953, 1954, and 1955 treated the gains from the sale of lots, in the amounts of $33,-237.76, $21,246.13, and $13,220.57, respectively, as long-term gains from sales of capital assets. The respondent in the notice of deficiency determined that these profits constituted ordinary income. It has been stipulated that the petitioner erroneously omitted from his income for 1954 an amount of $2,480.61 realized in a taxable exchange of properties.

During the years 1953, 1954, and 1955 and for many years prior thereto the petitioner was engaged in the business of acquiring and selling real estate, and the lots sold in the years in question, and those sold in prior years resulting in receipt of installment payments in the years in question, were held for sale to customers in the ordinary course of that business.

### OPINION.

The only issue presented is whether amounts received in the years 1953, 1954, and 1955 representing gains from sales of lots constituted ordinary income as determined by the respondent, or long-term capital gain within the meaning of section 117(a)(1) of the Internal Revenue Code of 1939 [1] (and the similar provisions of section 1221(1) of the Internal Revenue Code of 1954), as contended by the petitioner. The answer depends upon whether the lots were "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

The question presented is essentially one of fact. Although there have been many cases involving this issue under varying factual situa-

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *

tions, in the final analysis the decision must rest upon a consideration of all facts present in the particular case. Many factors have been considered by the courts as aids in determining this question, although no one factor is necessarily decisive. Among the criteria used are the nature of the acquisition of property, that is, whether for sale or investment; the frequency and continuity of transactions over a period of time as distinguished from isolated transactions; substantiality of transactions; and the activity of the seller with respect to the property, such as the extent of his improvements or his activity in promoting sales. *Pool* v. *Commissioner*, (C.A. 9) 251 F. 2d 233, certiorari denied 356 U.S. 938, affirming a Memorandum Opinion of this Court; *Mauldin* v. *Commissioner*, (C.A. 10) 195 F. 2d 714, affirming 16 T.C. 698; *Frankenstein* v. *Commissioner*, (C.A. 7) 272 F. 2d 135, certiorari denied 362 U.S. 918, affirming 31 T.C. 431; and *Joseph M. Philbin*, 26 T.C. 1159. In *Rollingwood Corp.* v. *Commissioner*, (C.A. 9) 190 F. 2d 263, affirming a Memorandum Opinion of this Court, it was stated:

While the purpose for which the property was acquired is of some weight the ultimate question is the purpose for which the property is held. *Richards* v. *C.I.R.*, 9 Cir., 81 F. 2d 369 * * *. Most of the cases dealing with the problem of whether property is held primarily for sale to customers in the ordinary course of trade or business involve situations where the taxpayer is engaged in some activity apart from his usual occupation and the question is whether this activity amounts to a business. The test normally applied in these situations is the frequency and continuity of the transactions claimed to result in a trade or business. * * * [Citing a number of cases.]

The petitioner commenced acquiring vacant lots in 1930 or 1931 through the acquisition of street improvement bonds. However, it was not until 1941 that he sold any such lots. From that point on he both acquired and sold many vacant lots, the average number sold annually between 1941 and 1952 being approximately the same as the number sold annually in the years in question.

In 1953 the petitioner made 45 sales covering 64 lots which he and his wife owned, and in that year there were also 23 sales involving 75 lots in which he owned a part interest together with others, a total of 68 transactions involving 139 lots. In 1954 he made 33 sales involving 79 lots which he and his wife owned, and in that year there were also 8 sales involving 10 lots in which he owned a part interest together with others, a total of 41 transactions involving 89 lots. In 1955 he made 20 sales covering 46 lots which he and his wife owned, and in that year there were also at least 5 sales involving 13 lots in which he owned a part interest together with others, a total of at least 25 sales involving 59 lots. In 1956 the large number of sales continued, there being 25 sales involving a total of 80 lots.

On brief it is argued on behalf of the petitioner that his purchases of street improvement bonds constituted investments, that he was forced to resort to the underlying security, namely, the unimproved lots, that such lots thus acquired the status of investment property, and that hence the sales in the years in question constituted liquidations of investments. He further contends that he never did go into the business of buying and selling lots, and in this connection he points to the fact that practically all of his time was devoted to the practice of law, and that he did not advertise or otherwise actively solicit purchasers.

We have carefully considered the petitioner's testimony with respect to his purpose in acquiring street improvement bonds and the underlying vacant lots. Although he referred to the acquisitions of street bonds as investments and stated that they were good investments, being first liens on the underlying properties and bearing tax-free interest at the rate of 6 per cent, it is our conclusion, based upon his testimony as a whole, together with all of the other evidence of record, that in reality he did not purchase the bonds for the purpose of investment therein, but, rather, that he acquired them as a means of acquiring title to the vacant lots underlying them. There is no indication whatever in the record that the petitioner, either before or after 1953, held any bonds for any appreciable length of time. On the contrary, the record indicates that he expected and intended to obtain the underlying lots either by foreclosure or by acquisition of tax deeds. He testified that in the depression years his law firm foreclosed thousands of these bonds. And, although after 1953 he ceased acquiring title to lots through payment of delinquent taxes, it is apparent that he continued to acquire them by foreclosure of bonds.

Furthermore, it is our conclusion upon the whole record that the purpose in acquiring the lots, even those acquired in the 1930's, was to hold them for sale to any purchaser who might be interested in buying. We think it was merely fortuitous that no lots were sold until 1941. It was not until 1941 that a demand for lots arose. Certainly when the demand did arise the petitioner was always willing to sell. He so testified, and mentioned only one or two instances of refusal to sell.

We recognize, of course, that it has been held that holding an asset for many years is a strong indication of an intention to hold for investment rather than for sale. *Palos Verdes Corp.* v. *United States*, (C.A. 9) 201 F. 2d 256. But even if it were considered that the lots acquired in the 1930's were originally held for investment, we are satisfied that after the demand for lots arose the petitioner held his lots for sale to customers. He continued to acquire lots at the same time he was selling lots, and the record indicates that he held both the earlier acquired and the later acquired lots, without distinction, for sale

to anyone who was interested in buying at a fair price. This is indicative of a going business. *Joseph M. Philbin, supra.* We note that among the lots sold in 1953 there were 6 which had been acquired in 1952; among those sold in 1954 there were 43 which had been acquired in 1952 and 1953; among those sold in 1955 there were 4 which had been acquired in 1953 and 1954; and among those sold in 1956 there were 28 which had been acquired since 1952, including 14 acquired in 1956.

The sales of lots in the years in question were not only frequent and numerous, but involved substantial amounts of money. The profits from such sales, plus profits from installments on sales made in prior years, amounted to $33,237.76, $21,246.13, and $13,220.57 in the years 1953, 1954, and 1955, respectively. The income from this source greatly exceeded the net income from his law practice in the years 1953 and 1954 and was substantial in 1955 in comparison to his net income from his law practice. The net income from his law practice was $7,669.20, $6,289.80, and $19,274.52, respectively, in the years in question.

As a further indication that the petitioner was holding his lots for sales to customers in the course of a trade or business, we note that a substantial number of his acquisitions and sales of lots were in joint venture with Kenneth Mark and Joseph Schreve. Mark had a real estate license and Schreve's two companies also had real estate licenses. The agreement in each joint venture was that petitioner would perform the legal services and that Mark or Schreve would handle the sales.

The petitioner makes much of the fact that substantially all of his time was devoted to the practice of law. However, it has been held that a person can be in more than one business. *Richards* v. *Commissioner*, (C.A. 9) 81 F. 2d 369, affirming 30 B.T.A. 1131, and *Achong* v. *Commissioner*, (C.A. 9) 246 F. 2d 445, affirming a Memorandum Opinion of this Court. It has been held other full-time employment does not prevent one from being in the real estate business. *Fackler* v. *Commissioner*, (C.A. 6) 133 F. 2d 509, affirming 45 B.T.A. 708.

The petitioner also stresses the fact that he devoted very little time to sales of lots, and that he did not advertise or otherwise solicit purchasers, citing a number of cases which hold that the word business means "busyness." *Snell* v. *Commissioner*, (C.A. 5) 97 F. 2d 891, affirming a Memorandum Opinion of this Court; *Dunlap* v. *Oldham Lumber Co.*, (C.A. 5) 178 F. 2d 781; *Ross* v. *Commissioner*, (C.A. 5) 227 F. 2d 265, reversing a Memorandum Opinion of this Court. We think there was certainly "busyness" on the part of the petitioner in the acquisition and sale of the large number of lots dealt with in the

years in question and prior thereto. The petitioner, either personally or through his secretary, was consistently engaged in the activity of acquiring title to lots, discussing proposed sales, and transferring title to lots. A lack of "busyness" with respect to solicitation of purchasers is not decisive where, as here, there was a seller's market and purchasers sought out the petitioner. *Mauldin* v. *Commissioner*, *supra; Patrick* v. *Commissioner*, (C.A. 7) 275 F. 2d 437, affirming 31 T.C. 1175; and *Arthur E. Wood*, 25 T.C. 468.

On brief the statement is made that the petitioner ceased to acquire lots after 1953 except where necessary to protect his interest in street bonds. Actually the testimony of the petitioner was to the effect that after 1953 he ceased acquiring lots through the acquisitions of tax deeds.

The petitioner relies heavily upon *Austin* v. *Commissioner*, (C.A. 9) 263 F. 2d 460, which reversed a Memorandum Opinion of this Court. However, as recognized in the *Austin* case, each case must be decided upon its particular facts. A careful analysis of the *Austin* case discloses that there are vital differences between the facts there involved and those here present. As stated in that case, while the ultimate question is the purpose for which the property is held, the purpose for which property is acquired may throw light on the ultimate question and is entitled to some weight. There the properties sold were acquired as a result of various circumstances. Some, as in the instant case, were received in payment of legal fees. The remainder were acquired for such reasons as: To protect the character of the neighborhood; to further the acquisition of a park proposed by the Manhattan Beach Property Owners' Association; to provide a parking lot adjoining business property; for homesites; for rental purposes; and to fulfill an obligation to the City guaranteeing it against loss upon acquisition of property from the State. The Court of Appeals concluded that the pattern of acquisitions was inconsistent with any claim that the petitioner was in the business of acquiring real estate for the purpose of sale, and this had an important bearing upon its ultimate conclusion in the case. As stated above, we think the evidence in the instant case indicates that the acquisitions at least from 1942 on were for purpose of sale, and that earlier acquired lots, even if not acquired for sale, were, in the years in question held for sale. It was also pointed out in the *Austin* case that in the 3 years in question the taxpayer purchased only one lot, whereas in the instant case the petitioner continued to acquire numerous lots.

For the reasons set forth above, we have concluded and have found as a fact that during the taxable years and for many years prior thereto the petitioner was engaged in the business of acquiring and

selling real estate and that the real estate lots which were sold and which gave rise to the income in question in the years in question constituted property held primarily for sale to customers in the ordinary course of that trade or business. In accordance with the intention of Congress that profits arising from the everyday operation of a business should be considered as ordinary income, we approve the respondent's determination. *Corn Products Refining Co.* v. *Commissioner*, 350 U.S. 46.

*Decision will be entered under Rule 50.*