William H. Miller v. Commissioner.
Miller v. Commissioner
Docket No. 81398.
United States Tax Court
T.C. Memo 1962-198; 1962 Tax Ct. Memo LEXIS 110; 21 T.C.M. (CCH) 1070; T.C.M. (RIA) 62198; August 17, 1962
*110 1. Petitioner bought numerous lots at tax sales, cleared the titles and paid liens against them, and sold them at a profit. Held, the lots were held by petitioner in 1954 and 1955 primarily for sale to customers in the ordinary course of his business and the profit on the sale of these lots was taxable as ordinary income. 2. Held, petitioner is liable for additions to tax under section 294(d)(1)(A), I.R.C. 1939, for 1954, and under section 6654, I.R.C. 1954, for 1955. I. Raymond Kremer, Esq., for the petitioner. Gustave J. Soderberg, Jr., Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DENNEN, Judge: Respondent determined deficiencies in income tax and additions to tax as follows: Additions to tax
I.R.C. 1939
I.R.C. 1954
Year
Deficiency
Sec. 294(d)(1)(A)
Sec. 294(d)(2)
Sec. 6654
1954
$2,587.28
$418.43
$271.41 [1]
1955
1,525.94
$39.54
The issues for decision are (1) whether real property sold by petitioner in 1954 and 1955 was property held primarily for sale to customers in the ordinary course of a trade or business so that the profit therefrom was taxable *111 as ordinary income rather than as capital gain; and (2) whether petitioner is liable for the additions to tax under section 294(d)(1)(A), I.R.C. 1939, for 1954, and section 6654, I.R.C. 1954, for 1955. Findings of Fact Some of the facts, with exhibits attached, have been stipulated and are incorporated herein by this reference. There is no real dispute between the parties on the facts but only on the emphasis to be placed on various facts in applying them to determine the principal issue here involved. We find the basic facts to be as follows: During the years 1954 and 1955 petitioner was unmarried and a resident of Ridley Township, Pennsylvania. He filed his individual income tax returns for those years with the district director of internal revenue, Philadelphia, Pennsylvania. Petitioner has been a resident of Ridley Township since his birth there in 1918. During 1954 and 1955 he lived with his parents in their home there. His long residence and his numerous purchases and sales of property situated there have provided him with extensive knowledge of the township and its properties. From 1940 to 1946 petitioner was employed as a machinist, his wages ranging from approximately $20 *112 a week in 1940 to $70 a week in 1946. From 1948 to 1951 he was employed by the Delaware Paper Mills, where he did mechanical work and supervised the movement of machinery. His wages at Delaware were approximately $30 a week. Sometime in 1951 while away from home in connection with his employment at Delaware, he was stricken with a nervous disorder having the characteristics of what is commonly referred to as St. Vitus's dance (chorea minor). During the period 1951 to 1956, he was under the care and treatment of his family doctor and specialists in the field of mental or nervous disorders. He was hospitalized at one point during this period in connection with this illness. As part of his therapy he was instructed to go out in public and communicate with people as much as possible. Petitioner's illness prevented him from holding regular employment during the period 1951 to 1956. Since sometime in 1956, petitioner has held regular employment with the Pennsylvania Tax Equalization Board. In 1946, 20 to 25 percent of the land area of Ridley Township was delinquent in real estate taxes. This percentage has gradually declined since 1946 and at the time of the trial of this proceeding it had *113 been reduced to approximately 10 percent. Ridley Township is platted into 20-, 25-, 50-, and 60-foot lots, the 25-foot lots predominating. The real property in the township was assessed by lot and sold at tax delinquent sales by lot, but the average-sized lot was of such limited size that it was often impractical to bill real estate taxes by lot. It was not ordinarily feasible to build a house on the average-size lot. Approximately 2,000 lots in Ridley Township were delinquent in real estate taxes in 1948. For many years prior to 1948 Ridley Township had been plagued with extensive tax delinquent property and in an effort to correct the problem, township authorities publicized the fact and encouraged local inhabitants, including petitioner, to purchase tax deliquent land at tax sales "for investment." The township tax collector in 1948 made phone calls to individuals, and even distributed a circular letter, encouraging them to purchase tax delinquent property for "investment purposes." During the period 1948 to 1957, petitioner purchased approximately 320 different lots or tracts of real estate. Petitioner financed his original property purchases with $3,000 he had saved from his *114 wages. Almost all the property purchased by him during this period was purchased at tax delinquent sales and almost all of it was situated in Ridley Township. All the real property purchased by petitioner was vacant land, with the exception of a house in Media, Pennsylvania, which he purchased in 1953 and sold at a loss in 1955. While petitioner purchased a significant number of individual lots or tracts of land, the majority of his purchases consisted of groups of lots. Petitioner normally purchased large numbers of individual lots or groups of lots on the same day. The following schedule approximately details his lot-purchasing activities during the period 1948 through 1957: [2]
Number of lots
Number of days in
or tracts of
year on which
property
purchases oc-
Year
purchased
curred
1948
23
3
1949
2
2
1950
37
5
1951
16
3
1952
32
4
1953
131
7
1954
33
9
1955
32 *
12
1956
13
9
1957
1
1
320
Petitioner's last *115 purchase of real property prior to the trial of this proceeding [3] was made on September 19, 1957. The titles that petitioner acquired to property purchased at tax delinquent sales were ordinarily not marketable ones. Many of them were subject to municipal liens 20 to 25 years old. Petitioner retained an attorney to clear his titles and to assist him in having old liens removed so that he could market his property. Petitioner and his attorney, who also bought and sold real estate in the local area, bought a number of properties in partnership. On a few occasions when they did so, the attorney handled the whole transaction with petitioner merely sharing the cost and the profits. During 1954 and 1955 petitioner did not buy or sell any property in partnership with his attorney. Petitioner's primary purpose for purchasing real property during the period 1948 to *116 1957 was to hold the property until its value increased and then sell it for a profit. He did not subdivide, develop, or make any physical improvements - except those required by the local government - to any of his property, except that property which he maintained for his personal use. Petitioner sold real property in every year except one during the period 1950 through 1959. While his sales occasionally involved only 1 or 2 lots or tracts of property, the majority of his individual sales involved 6 or more lots, some of them involving up to 25 lots. A number of the individuals who purchased land from petitioner in 1954 and 1955, as well as in the years prior and subsequent thereto, were either realtors or in the real estate development business and these individuals ordinarily purchased from him in volume. Some of these individuals were repeat customers. The following schedule approximately details by year petitioner's real property sales: Number of indi-
Number of lots
vidual sale
or tracts
Year
transactions
sold
1950
2
16
1951
1
2
1952
6 * *117 62
1953
1
8
1954
15
44
1955
7
49 **
1956
4
25
1957
2
25
1958
0
0
1959
2
32
Total
39
263
At the time of the trial of this proceeding in 1961 petitioner owned approximately 35 lots or tracts of real property, 6 of these being the situs of his personal residence. Most of the sales made by petitioner during the period 1950 to 1959 were unsolicited. The majority of petitioner's customers were either friends or acquaintances who were aware of petitioner's land holdings, or individuals who had made inquiries at the town hall about property for sale and had been referred to petitioner by the town officials. Frequently, when individuals came to his house inquiring about his land, he drove them to the land and showed it to them. On a few occasions, when individuals desiring to purchase land came to his residence, his illness prevented him from seeing them. In some of these instances his attorney handled the sale for him. Petitioner advertised lots for sale on approximately three different occasions during 1953 and 1954. In each case they were small classified advertisements, listing only the size of the lot, the cost, and the telephone number of the home of petitioner's parents where petitioner resided. One advertisement *118 in late 1953 listing for sale a lot 60 by 150 feet resulted in the sale of 12 lots to eight different individuals. The majority of these purchases were closed on the same day, March 2, 1954. Petitioner sold 3 lots in 1954 and 3 lots in 1955 through realtors. In each case he paid the realtors their full commission for the sale. Until the late 1940's Ridley Township was a very rural area, but in the late 1940's and through the 1950's it experienced a marked increase in population and considerable new development and building on its land. During the 10-year period 1945 to 1955 the population increased from approximately 8,000 to approximately 25,000. During the period 1945 to 1960 the assessed valuation of Ridley Township increased from approximately $12 million to approximately $33 million. During 1954 and 1955 petitioner did not have a private telephone. When advertising property in the newspaper, he would list the telephone number of the telephone in his parents' home. During all periods material to this case he kept no books in connection with his real estate activities, he employed no one other than the individuals mentioned to assist him or act as his agent in his real estate activities, *119 he had no business stationery, he posted no signs advertising his property, and he had no license to act as a real estate broker or salesman. Petitioner reported his profits from the sale of real property in 1954 and 1955 on his tax returns for those years as gains and losses from the sale of "capital assets." In 1954 he reported short-term gains of $163.48 and long-term gains of $14,920.13. In 1955 he reported short-term gains of $5,160.60 and long-term gains of $8,459.98. In determining his gains and losses in 1954 petitioner included in the cost price of each lot or tract of property sold the legal fees he paid to have his title cleared and the amount of back taxes, assessments, interest, and penalties he had to pay to release old liens. In determining his gains and losses in 1955 he divided the total amount he expended for such items during that year, or the amount that he expended for these items with respect to the property sold that year, by the number of individual sales transactions in that year and listed that figure as the expense of sale for each transaction. Petitioner took no deductions for business expenses on his tax returns in 1954 and 1955. Petitioner's holding periods *120 for the real property sold in 1954 varied from 2 to 15 months, the average holding period for property sold in that year being 10 months. His holding periods for property sold in 1955 varied from 1 day to 25 months, the average holding period for property sold in that year being 18 months. The only other income reported by petitioner in 1954 was $1,584.50 he received for selling a carload of wood, $192.38 in rent from the house in Media, Pennsylvania, and $150 dividend income. The only other income reported by petitioner in 1955 was $490 he received for selling storm windows and/or referring a customer to a builder and $550 in dividend income. Petitioner listed no occupation on his 1954 income tax return. On his 1954 self-employment tax return he listed himself as a "Real Estate Salesman." On his 1955 income tax return and on his 1955 self-employment tax return he listed himself as a "Salesman." Petitioner filed no declaration of estimated tax for the years 1954 and 1955. He filed his 1954 income tax return and paid the tax computed to be due thereon prior to January 15, 1955. Petitioner realized profits from the sale of real property in the amount of $5,454.52 during the period January *121 1 to March 15, 1954. Petitioner filed his 1955 income tax return and paid the tax computed to be due thereon about January 1, 1956. Ultimate Finding of Fact The real estate sold by petitioner in 1954 and 1955 was held at the time of sale primarily for sale to customers in the ordinary course of petitioner's trade or business. Opinion The principal issue before the Court is whether petitioner's profits from the sale of real estate during the years 1954 and 1955 are taxable as ordinary income or as gains from the sale of "capital assets." Petitioner contends that the lots he sold in these years were held for "investment purposes" and therefore were "capital assets," within the meaning of section 1221 of the Internal Revenue Code of 1954. [4] Respondent determined that the real estate sold by petitioner in these years was held at the time of sale primarily for sale to customers in the ordinary course of his business and therefore was excluded from the definition of "capital asset" by subsection (1) of section 1221. Section 1237 is not applicable to the facts in this case. Whether property *122 was held primarily for sale to customers in the ordinary course of a trade or business within the meaning of subsection (1) of section 1221 is a question of fact in each case. In the numerous cases involving this issue, however, certain criteria have been evolved for utilization in resolving it. These include (1) the circumstances surrounding the acquisition of the property in question, (2) the taxpayer's original purpose for acquiring the property, (3) the purpose for which it was held at the time of sale, (4) how frequent, substantial, and continuous the taxpayer's purchase and sale activities were, (5) how active the taxpayer, or those acting on his behalf, was in improving, or subdividing the property for sales purposes, and (6) how active the taxpayer, or those acting on his behalf, was in advertising or otherwise soliciting sales. W. Linton Atkinson, 31 T.C. 1241 (1959); Joseph M. Philbin, 26 T.C. 1159 (1956); W. T. Thrift, Sr., 15 T.C. 366 (1950); Boomhower v. United States, 74 F. Supp. 997 (N.D. Iowa 1947). No single test is decisive, however, and the issue must be resolved through consideration of all the pertinent facts of the particular case. We think where, as here, *123 a person frequently and continuously buys real estate for the sole purpose of reselling it at a profit to whoever wants to buy it, he is in the business of dealing or trading in real estate, the purchasers are his customers in that business, and the property he buys and sells is held by him primarily for sale to those customers within the meaning of section 1221(1) even though, because of the particular circumstances, his activities do not meet all of the criteria used as guides in the various cases which have dealt with this issue. Real Estate Corporation, 35 T.C. 610 (1961), affd. 301 F.2d 423 (C.A. 10, 1962). None of the property held and sold by petitioner in 1954 and 1955 had been acquired involuntarily through gift, bequest, or as part of another unrelated transaction, but was all voluntarily acquired by him for the primary purpose of making a profit on its resale. Most of the property was vacant land which produced no income and petitioner made no improvements to it which would make it productive of income except through resale, and the evidence indicates that this was his intention when he originally started acquiring these lots, during the years here involved, and throughout *124 the period of his activities in this field. Petitioner held the lots sold in 1954 for periods ranging from 2 to 15 months, the average holding period being less than 11 months. His holding period for lots sold in 1955 varied from 1 day to 25 months, the average being 18 months, but more than one-third of the profits he derived from the sale of real estate in that year were derived from the sale of property held for less than 6 months. Over 90 percent of petitioner's income during the years in question, and, we assume from the evidence, during the several years before and after 1954 and 1955, was derived from his real estate transactions. He engaged in no other business activities during these years and his only other income was a small amount of dividends and rent in addition to $1,584.50 he received from the sale of a carload of wood in 1954 and $490 he received from the sale of storm windows and/or for referring a customer to a builder in 1955. While we attach little significance to it under the circumstances in this case, petitioner indicated on his income tax returns for 1954 and 1955 that his occupation was that of "Real Estate Salesman" and "Salesman" in those years, respectively. *125 See Kaltreider v. Commissioner, 255 F. 2d 833 (C.A. 3, 1958), affirming 28 T.C. 121 (1957); White v. Commissioner, 172 F. 2d 629 (C.A. 5, 1949), affirming a Memorandum Opinion of this Court. During 1954 petitioner sold 44 lots in 15 different transactions, realizing a profit of $15,083.61. In 1955 he sold 49 lots in 7 different transactions and realized a profit of $13,620.58. During 1954 and 1955 he purchased 33 and 32 lots on 9 and 12 different occasions, respectively. We view these real estate transactions as frequent, substantial, and indicative of a continuing business activity. See Joseph M. Philbin, supra; Solly K. Frankenstein, 31 T.C. 431 (1958), affd. 272 F. 2d 135 (C.A. 7, 1959), certiorari denied 362 U.S. 918 (1960). We are not convinced from the evidence that the disparity between the number of individual lots sold and the number of separate sales transactions is attributable to anything other than the fact that petitioner's customers for the most part wanted large tracts of land and that a number of petitioner's purchasers were either real estate dealers or developers who ordinarily purchased in volume. Northing in the evidence suggests any reticence on petitioner's *126 part to engage in more individual transactions or to pick and choose his customers. [5]
Another fact that we have considered in this case is the marked increase in petitioner's real estate activities subsequent to 1951 when illness prevented him from holding regular employment, and the marked decline in his real estate activities following his return to regular employment in 1956. Inherent in this fact is the conclusion that petitioner, finding himself unable to continue in his regular employment, turned to the less time-consuming and demanding business of buying and selling real estate for his livelihood and that he continued in this business until he was able to return *127 to regular employment in 1956, or until the property available for purchase at tax sales became so depleted as to require petitioner to turn to some other activity as a source of income. Also of some evidentiary value in determining whether petitioner considered himself in the real estate business during these years is the method used by petitioner to determine gains and losses from the sale of property in 1955. On his tax return for that year he divided the number of sales transactions he consummated into either the total amount he expended for legal fees and for the release of old liens in that year, or the total amount expended for these things in connection with the lots sold in that year, and listed this figure as his "Expense of sale" for each sale transaction. Either way his procedure is more akin to one that would be used by an individual in the business of buying and selling real estate to determine his business expense than it is to the procedure that would be used by the casual investor in real estate. Petitioner argues that the facts that most of his sales were unsolicited, he did very little advertising, made no physical improvements to make the property more salable, *128 had no office, telephone, or business expense, did not have a real estate broker's license, did not hold himself out to the public as being in the real estate business, and had no reputation for being a real estate dealer all tend to prove that he was not in the real estate business. Certainly these are factors to be considered, and we have taken them into consideration, but we know of no reason why a person cannot be in the business of dealing in real estate, "out of his pocket" so to speak, where the circumstances permit, as they did here. This Court and other courts have frequently pointed out that it is not essential that a taxpayer advertise or solicit customers to be in the real estate business, particularly where there is a seller's market and/or there are other circumstances which obviate the need for such activities. Joseph M. Philbin, supra; Arthur E. Wood, 25 T.C. 468 (1955); C. E. Mauldin, 16 T.C. 698 (1951), affd. 195 F. 2d 714 (C.A. 10, 1952). Ridley Township during these years experienced a marked growth in population and considerable development of its land area. Petitioner's ability to sell so many lots at such a considerable profit with so little solicitation, *129 together with the evidence that he was able to consummate eight separate sales involving 12 different lots in 1954 through the placing of one small advertisement in the classified section of the newspaper, makes it quite apparent that a seller's market in land existed during these years. Furthermore, petitioner knew almost everyone in the area and it was well known to his acquaintances and the town officials, who frequently referred prospective purchasers of land to petitioner, that he had property for sale, which obviated the necessity for extensive advertising. While petitioner made no physical improvements to the property he bought and sold, it is clear that the clearing of titles and removal of liens from property purchased at tax sales is fully as important as physical improvements to improve the salability of vacant lots. Joseph M. Philbin, supra; J. Roland Brady, 25 T.C. 682 (1955). And the fact that petitioner did not hold a real estate broker's license has little probative value in this case because such a license is not required in Pennsylvania when an individual merely engages in the business of selling his own land. See Pa. Stat. Ann. tit. 63, sec. 432 (1961). Petitioner's *130 basic premise is that he was simply liquidating an investment rather than engaging in the real estate business. While the term "investment" has frequently been used by the courts in cases of this sort, despite the fact that it does not appear in the statute, it has rarely been defined, and we do not propose to define it here. In its broad sense "an investment" could probably be said to include any use of one's funds to buy something which will produce a profit either in the form of income or a gain on resale. But when used to describe the purposes for which real estate is held under the statutes here involved, we think it connotes either an acquisition for the purpose of receiving income produced by the property held or at least an acquisition for the purpose of holding the property for a considerable period of time to realize a profit on the normal increment in value of the property through passage of time or growth and development of the area. Accord, J. Roland Brady, supra; Gamble v. Commissioner, 242 F. 2d 586 (C.A. 5, 1957), affirming a Memorandum Opinion of this Court. We do not think the frequent and continuous voluntary purchase of lots or tracts of land at tax sales for *131 the avowed purpose of clearing title and selling them at a profit within a relatively short time constitutes an investment within the meaning of the word as used in this context. Accord, J. Roland Brady, supra; Arthur E. Wood, supra.And it can hardly be said to be a mere "liquidation" of an investment when the taxpayer is constantly using the proceeds of his sales to purchase additional properties for the same purpose. See Goldberg v. Commissioner, 223 F. 2d 709 (C.A. 5, 1955); Austin v. United States, 116 F. Supp. 283 (S.D. Tex. 1953). Upon examining all the evidence in this case in the light of all the factors used as guideposts in the numerous decided cases dealing with this subject, we have concluded that the real estate sold by petitioner in 1954 and 1955 was held by him primarily for sale to customers in the ordinary course of his trade or business, and that the income therefrom was ordinary income, as determined by respondent, rather than capital gain as reported by petitioner. The only other issue is whether petitioner is liable for the addition to tax for 1954 under section 294(d)(1)(A) of the 1939 Code for failure to file a declaration of estimated tax as required by *132 section 58(a) of that Code, and the addition to tax for 1955 under section 6654 of the 1954 Code for underpayment of an estimated tax. While petitioner raised this issue in his petitioner and introduced some evidence with respect thereto, it is not argued by petitioner on brief and we assume it is abandoned. However, on the evidence presented we conclude that petitioner is liable for the additions to tax in any event. Petitioner did not file a declaration of estimated tax for 1954 and he introduced no evidence as to the reason for this failure. The evidence indicates that petitioner had income of over $5,000 from the sale of land prior to March 15 of that year. Even if this had constituted capital gain petitioner would have been required to file a declaration of estimated tax under section 58(a), I.R.C. 1939, prior to September 1, 1954. Hence, the filing of a final return and payment of the tax by January 15, 1955, did not constitute a declaration of estimated tax under section 58(a). With respect to the addition to tax for 1955, section 6654 of the 1954 Code provides an addition to tax for underpayment of the estimated tax required to be paid under section 6153, regardless of extenuating *133 circumstances, Estate of Barney Ruben, 33 T.C. 1071 (1960), unless the taxpayer shows himself to come within the exceptions prescribed in section 6654(d). Petitioner has not done so in this case and is liable for the addition to tax. However, we believe respondent has erred in computing the amount of the addition to tax by computing it to January 15, 1956, rather than to the date of payment, which appears to have been January 1, 1956. This error can be corrected under Rule 50. Decision will be entered under Rule 50. Footnotes
1. Respondent has conceded that there is no addition to tax due under section 294(d)(2), I.R.C. 1939↩, for the year 1954.
2. While there are some discrepancies between the number of lots bought and sold and the number of buying and selling transactions as claimed by petitioner and respondent and as found by the Court, our conclusion would not be changed whichever figures are used. ↩
*. One of these purchases was a tract of land comprising 3.09 acres.↩
3. Petitioner testified that he stopped his real estate purchasing activities in 1957 because there were no more lots for sale in Ridley Township. This testimony seems to be contradicted by the testimony of Raymond Hood, who estimated that 10 percent of the property in Ridley Township was still tax delinquent at the time of trial.↩
*. In two of these transactions involving 30 lots the lots were jointly owned by petitioner and his attorney. **. One of these tracts was 3.09 acres in size.↩
4. All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
5. While there is evidence in the record that the average lot in Ridley Township was small, there is no evidence that the lots held by petitioner were of limited size, the specific lots about which we do have evidence having been 60 by 150 feet. Consequently, we can attribute little weight to petitioner's argument that the number of lots he dealt in gives an exaggerated and unrealistic picture of the substantiality of his real estate activities, but even if we were to give it more weight it would not change our decision.↩